**Bill SEARS, Appellant (Defendant),**

**Jean Sears (Defendant),**

v.

**SUMMIT, INC., a South Dakota corporation registered and authorized to do business in Wyoming, Appellee (Plaintiff).**

No. 5293.

Supreme Court of Wyoming.

Aug. 27, 1980.

Thomas D. Roberts, Morgan & Brorby, Gillette, for appellant.

Edward S. Halsey, Newcastle, Gary D. Jensen, and Horace R. Jackson, Lynn, Jackson, Shultz & Lebrun, P. C., Rapid City, S. D., for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

McCLINTOCK, Justice.

The questions presented by this appeal concern the respective rights of a landowner and a construction company who were both found to have committed acts of trespass against the other. Summit brought suit against Bill and Jean Sears seeking actual and exemplary damages for the unlawful detention of its heavy road–construction equipment and vehicles. By answer and counterclaim, Bill and Jean Sears demanded actual and exemplary damages for Summit's trespass upon their property. Following a jury trial, the district judge entered judgment against defendant Bill Sears in the amount of $2,941.86 actual damages and $4,000.00 punitive damages and against plaintiff Summit in the amount of $985.00 actual damages. Before submitting the case to the jury, the district court judge held, among other things, that there was no evidence that would sustain punitive damages in favor of defendants and, therefore, he did not submit this question to the jury. Because we feel that there was sufficient evidence to sustain an award of punitive damages against Summit, we find that the trial court erred in failing to submit the question to the jury. We also find that the district court judge erred in instructing the

jury to consider the wealth of the defendant when assessing punitive damages against him because there was no evidence of the defendant's wealth presented at trial.

On September 4, 1979, Summit, Inc., began moving a convoy of heavy road–construction equipment consisting of one TS–24 Power Spray, four 651B Scrapers, one 12F Patrol, two flatbed trucks, one service truck, two or three company pickup trucks, and a station wagon south of Newcastle, in a westerly direction along a county road called the Morrissey Road. The testimony indicates that while the convoy could have traveled to its jobsite using public highways, Summit chose to transport its equipment on the county road to save time and permit fees, and because Summit felt that it would be less hazardous to use a county road.

After traveling along the Morrissey Road for approximately 32.7 miles during which time the convoy encountered 29 cattle guards and numerous no–hunting, no–trespassing signs, the convoy encountered a fork in the road. One branch of the road went slightly to the left and the other branch turned sharply to the right. The testimony indicates that the road branching to the left appeared to be a good graveled road, similar to the county road that the convoy had just traveled over, whereas the branch to the right was in poor condition. There was no sign indicating which branch was the Morrissey Road, and because the convoy's superintendent thought that the road to the left was a continuation of the county road he directed the convoy to proceed down the left fork. This fork of the road was not, as it turned out, a continuation of the county road but a private road owned by Bill and Jean Sears.

After traveling approximately one–quarter of a mile down the left branch of the road, the convoy came to a cattle guard that not only had a steel gate but also a no–trespassing sign thereon that read:

"4W RANCH.
PRIVATE ROAD
NO TRESPASSING"

Swift, a Summit construction superintendent, testified that the cattle guard and the no–trespassing sign presented nothing unusual; however, the steel gate made him question whether the convoy had taken the correct branch of the road. At this point, he halted the convoy and took off in his pickup truck to investigate. First, he went back to the fork in the road and traveled down the right branch for approximately three or four miles. He testified that because this road was a narrow dirt road with an occasional oil tank or drilling rig on the side of the road he did not think this was the county road. He also testified that he was sure that this road would eventually end in a dead end.

Swift then went back to the convoy and drove past it until he came to several buildings that were located next to the road. He stopped at these buildings in order to inquire whether the convoy was on the correct road. After finding no one at home, he radioed another Summit superintendent in an attempt to determine whether or not the convoy was on the correct road. He was advised by the superintendent that the convoy was on the correct road and that it should proceed. It is interesting to note that although Swift was unfamiliar with the area, he did not purchase a county map. He had begun this journey with only a hand-drawn map that he had drawn with the directions of a transport driver.

After talking with the other superintendent, Swift returned to the convoy and directed his men to proceed. Apparently the next thing the convoy encountered was a wooden bridge that had a sign posted on it that read:

"NO TRESPASSING
4W RANCH
PRIVATE ROAD
NO TRESPASSING"

Further down the road there was still another sign indicating that this road was a private road. The sign stated:

"4W RANCH
NO TRESPASSING
NO THRU TRAFFIC"

We note particularly that while previous signs along the Morrissey Road had said merely "NO HUNTING" and "NO TRESPASSING," the last three signs specifically referred to "PRIVATE ROADS" or "NO THRU TRAFFIC," thereby indicating that it was the road itself and not the surrounding area that was closed.

Undaunted by these signs, the convoy continued on its way until it arrived at yet another fork in the road. Once again Swift halted the convoy and proceeded to investigate one of the two branches of the road. While Swift was so engaged, Bill Sears, toting a loaded .357 magnum revolver with the price tag still hanging from the handle, appeared at the scene. Sears, apparently outraged by the presence of the convoy on his private road, decided to take the law into his own hands. He ordered the crew to get off their equipment and to follow him. When Sears reached the pickup truck in which Assistant Superintendent Sparger was sitting, he pulled the revolver out of his pants and began waving it around, periodically pointing it at Sparger.

Sears then ordered Sparger to shut down the machinery, stating that the equipment could not be removed from Sears' property until someone paid for the damage that the convoy had done to his property. Apparently Summit's crew remained in control of their emotions, while Sears continued to wave his revolver, shouting obscenities. Sparger managed to contact Swift on the radio. Swift told Sparger to go along with Sears' order to shut down the equipment and to leave it on Sears' road.

Sears escorted the crew off his property by the same route that they had entered. The crew rode in Sparger's pickup truck with the exception of one man who rode in the station wagon driven by his wife. After traveling about a mile and a half, Sears slammed on his brakes and pointed to a cattle guard, stating that the cattle guard was the "first goddamn thing" that was going to be replaced by Summit. At another point, Sears came speeding up from behind Sparger's pickup and once again slammed on his brakes. This time Sears

jumped out of his pickup, jerked the gun out of the holster, threw the holster into the air, cocked the gun and put his finger on the trigger. Sears then pointed the gun at Sparger and demanded that Sparger get out of the pickup. Before getting out of the pickup, Sparger asked whether Sears would shoot him if he got out of the truck, but Sears did not respond to the question. Sears merely repeated his original demand. Having no other choice but to obey Sears' command, Sparger got out of the truck. Sparger testified that Sears then said,

"I'm charging all of you men with trespassing [sic]. I want every man's name and driver's license number. I'm going to see that you are arrested for tresspassing [sic]."

At this point, Sears ordered Sparger to give him a list of names and driver's license numbers of the crew. Using a Summit time card Sparger began writing down each man's name and driver's license number while Sears was standing in front of the pickup truck with "his left arm on the hood and his right arm and the pistol pointed at me [Sparger] laying over the hood." The gun was still cocked and Sears had his finger on the trigger. Sears also continued using abusive language.

After Sparger completed the list and gave it to Sears, Sears set off to find Superintendent Swift. When Sears encountered Swift, he nearly ran Swift off of the road. Sears then jumped out of his pickup truck and at this point the two men became engaged in a fistfight. While there is conflicting testimony as to the cause of the fray, it finally ended when Swift was able to "choke him [Sears] down." After the fray ended, Sears was able to discuss the situation with Swift. He told Swift that the equipment would be detained until Sears was paid for the damages, and that Swift and his men would be arrested for trespass.

Summit did not recover its equipment until the next day after Swift, Sears and a sheriff's deputy viewed the damages to Sears' property. The damage consisted of damaged cattle guards and culverts, broken

power and water lines, and an earthen stock dam rendered useless.

The following issues raised by Sears will be considered on appeal:[1]

1. Did the trial judge err in ruling that as a matter of law Sears had committed an actionable trespass?

2. Did the trial judge err in ruling that there was no evidence presented at trial that would allow Sears to recover punitive damages against Summit?

3. Was the jury incorrectly instructed to consider the wealth of Sears when assessing punitive damages because there was no evidence presented as to Sears' wealth or lack of it?

4. Did the trial judge err in admitting the .357 magnum pistol into evidence?

■ With respect to the first question, Sears contends that his action was privileged because it was taken in defense of his property and that there was sufficient evidence presented at trial to support such a finding. We cannot agree.

As Sears has correctly pointed out, a directed verdict should only be granted when the evidence viewed as a whole without giving weight to the credibility of witnesses leads to only one rational conclusion. *Barnes v. Fernandez*, Wyo., 526 P.2d 983, 985 (1974).

The question, therefore, is whether there was sufficient evidence presented at trial from which reasonable men could have reached more than one conclusion as to whether Sears' action was privileged. In support of his contention that he was privileged to detain the equipment, Sears relies exclusively upon the Restatement (Second) of Torts, § 260 (1965). As provided in § 260, in order to claim privilege the evidence presented at trial must meet a two–pronged test:

"(1) Except as stated in Subsection (2), one is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if the act is, or is reason-

ably believed· to be, necessary to protect the actor's land or chattels or his possession of them, and the harm inflicted is not unreasonable as compared with the harm threatened. * * * "

As to the first test, Sears testified that he told Summit's employees that "[w]e're not going to move this equipment until we get somebody to decide something about what's going to be done about the damages." The evidence established that Sears did not detain the equipment to prevent further damage to his land, but did so in an attempt to force payment for the damages already done to his land. As to the second test, it cannot be shown that the harm inflicted to Summit by detaining costly, heavy road–construction equipment was reasonable compared to the harm that was done when the equipment was moved over Sears' private road.

In *Reed v. Esplanade Gardens, Inc.*, 91 Misc.2d 991, 398 N.Y.S.2d 929 (1977), an automobile owner who leased a parking space brought suit against the parking lot owner seeking to recover costs of removing warning stickers that were placed on his automobile because the automobile owner had not put the identifying decal on his automobile. The issue raised on appeal was "the scope of action available to a landowner when personalty trespasses on his land." *Reed*, supra, 398 N.Y.S.2d at 931. In discussing the question of privilege versus trespass the court stated:

"In such circumstances the landowner is privileged to deal with the personalty in a manner which would otherwise be a trespass or a conversion if the act is reasonably necessary to protect the actor's interest and the harm inflicted is not unreasonable compared to the harm threatened. * * * But the actor may be liable if he uses unreasonable force which causes harm to the chattel . . ." 398 N.Y.S.2d at 931.

In affirming the judgment for the automobile owner the court found that

1. Because the case is to be remanded to the district court for retrial of the question of punitive damages to be awarded against Sears, we need not discuss the question of whether the original award of punitive damages against Sears was excessive.

"[t]he plastering of stickers as done here is a punishment, constitutes interference with the motor vehicle beyond the penumbra of the landowner's interest and is unlawful. In these circumstances the landowner may not indulge in self–help and act as prosecutor, judge and jury." 398 N.Y.S.2d at 931.

Also see, *Postal Telegraph & Cable Co. v. Gulf & S.I.R. Co.*, 110 Miss. 770, 70 So. 833, 835 (1916).

Because we agree with the trial judge that the evidence could not support a finding that Sears was privileged to detain the construction equipment and that the detention constituted an unlawful interference, we find that the jury was correctly instructed that Sears as a matter of law had "committed a trespass against the equipment and vehicles of the plaintiff by reason of his detention of the same."

■ The next question is whether the district court judge was correct in ruling that there was no evidence presented at trial that would support an award of punitive or exemplary damages against Summit. Generally, punitive damages are proper where there has been an aggravated disregard of another's rights and where the imposition of punitive damages will tend to prevent this type of violation in the future, *Senn v. Bunick*, 40 Or.App. 33, 594 P.2d 837, 842 (1979); also see cases cited herein, and they are awarded because of their "civilizing influence" upon society, *Douglas v. Humble Oil & Refining Company*, 251 Or. 310, 445 P.2d 590 (1968).

■ The award of exemplary damages in a trespass action is a jury question, and such an award is proper upon a showing "that the acts, constituting the trespass, were committed with a reckless disregard for, or a willful indifference to, the rights of the plaintiffs." *Hall Oil Co. v. Barquin*, 33 Wyo. 92, 237 P. 255, 271 (1925). However, a party seeking exemplary damages is not required to show that the trespasser acted with actual malice or a wicked intent in order to recover punitive damages. *Hagenson v. United Telephone Company of Iowa*, Iowa, 209 N.W.2d 76, 82 (1973). A

showing of legal malice is sufficient to support an award. *Hall Oil*, supra, 237 P. at 272; *Senn*, supra, 594 P.2d at 842.

Actual malice requires a showing of actual ill will or hatred. However, legal malice has been defined as "wrongful or illegal conduct committed or continued with a willful or reckless disregard of another's rights." *McCarthy v. J. P. Cullen & Son Corp.*, Iowa, 199 N.W.2d 362, 369 (1972), cited with approval in *Hagenson*, supra, 209 N.W.2d at 82.

As stated in *McElwain v. Georgia–Pacific Corporation*, 245 Or. 247, 421 P.2d 957, 958 (1966):

"Malice is the term most frequently used in our decisions to define a state of mind that will justify the imposition of punitive damages. Malice, as a basis for punitive damages, signifies nothing more than a wrongful act done intentionally, without just cause or excuse. * * * The intentional disregard of the interest of another is the equivalent of legal malice, and justifies punitive damages for trespass." Cited with approval in *Senn*, supra, 594 P.2d at 842.

■ Summit argues in effect that it trespassed upon Sears' road without knowledge that the road was private. However, exemplary damages may be awarded even though entry was made in good faith. Citing Sutherland on Damages, this court in *Hall Oil Co.*, supra, 237 P. at 274, has pointed out that

"though an entry is made upon real estate under a conviction that the right to do so exists, if it is in fact wrongful, and willful injury is done to the plaintiff's property, the defendant will be liable for exemplary damages . . ."

This court went on to point out that

"[t]he rule is stated in Corpus Juris (17 C.J. 985) that, where an act is done in good faith, there can be no recovery of punitive damages, but that a mere belief in the right to do the act cannot shield a person, where there is no reasonable ground for it, nor if the act is done in a wanton and outrageous manner." *Hall Oil Co.*, supra, 237 P. at 275.

*Hall Oil Co.* involved a case where plaintiffs brought an action of trespass in which they were seeking both compensatory and punitive damages because defendants had allegedly entered their land and drilled for oil and gas without a right to do so. Defendants claimed that they entered the land under the authority of a lease that gave them the right to drill for oil and gas on plaintiffs' land. Plaintiffs claimed that the lease was void and the oil company knew of this claim before it entered plaintiffs' land.

In upholding the jury's award of punitive damages against defendants, this court stated:

" * * * There was no evidence of personal malice or ill will against the plaintiffs, on the part of either defendant, unless a conversation occurring in July, 1917, to be related, might be thought to indicate some such feeling at or before the trespass on the part of the Hall Oil Company. Nor do we think the evidence shows any act of oppression or conduct unusual to the work of drilling an oil or gas well. * * * But the circumstances under which the entry was made, and the drilling done, justified, we think, a finding of legal malice as the result of an unlawful act, willfully done, in view of the general finding for plaintiffs. And we think there was sufficient evidence also to justify a finding that the acts, constituting the trespass, were committed with a reckless disregard for, or a willful indifference to, the rights of the plaintiffs. In other words, the jury might reasonably have found, we think, upon the evidence introduced by the plaintiffs, if believed, that the defendants assumed the attitude of intending to drill the well upon the premises, whatever their rights under the lease, whether any or none, deeming it sufficient justification that they were able to pay any damage that might result therefrom, if it should ultimately be determined that they had no right whatever upon the land." *Hall Oil Co.*, supra, 237 P. at 271.

In *Hagenson, supra,* 209 N.W.2d 76, landowners brought actions against a telephone company for trespass on laying an underground cable along the landowners' private road. One of the issues presented on appeal was whether the district court properly submitted the question of exemplary damages to the jury.

Sometime before the trespass occurred, two residents in the area contacted the telephone company to inquire about the possibility of obtaining telephone services. However, the landowners never actually requested that telephone service be supplied. After the landowners made the inquiry, the commercial manager of the company requested that the engineering department survey the road and prepare a blueprint for the underground cable, stating untruthfully that there would be four new subscribers with the possibility of seven. The engineering department complied with this request. The matter, however, was never referred to the company's right–of–way officer and no easements were obtained.

After the survey and blueprint were completed, the construction supervisor began the actual process of laying the underground telephone cable. The record reflects that the construction supervisor never inquired who owned the road even though it was not a public road. And like the case at bar, there were two gates along the road that were closed at times and one of the landowners had a sign on his property stating that the road was a private way. In laying the cable, substantial damage was done to the road and the surrounding property. For example, trees were knocked down, one landowner's tile septic tank was damaged, and numerous drain pipes were dug out.

In affirming the award of punitive damages, the Iowa court stated:

"The evidence will not support a claim that the company knew the road was private but went ahead anyway. Rather, the evidence shows a mistake which the jury could reasonably find was committed 'with a willful or reckless disregard of another's rights' or 'without just cause or

excuse.'" *Hagenson,* supra, 209 N.W.2d at 82.

The court went on to observe:

"The jury could have found the engineering personnel must have observed the sign near the entrance that the road is private and also the gates farther on. Yet they did not contact the right–of–way officer, examine public records, or make inquiry to ascertain if the road was public." *Hagenson,* supra, 209 N.W.2d at 82.

█ In the case at bar, there is sufficient evidence to show that Summit should have known that the road it chose to travel down was a private road. There were three no–trespassing, private–road signs along Sears' road in addition to a steel gate.

We believe that this evidence standing alone is sufficient to support a finding of legal malice. For this reason, the question of punitive damages should have been presented to the jury.

The third issue raised by appellant concerns the award of punitive damages against him. Appellant contends that the trial judge erred when he instructed the jury to consider Sears' wealth when assessing punitive damages because there was no evidence presented at trial as to the economic status of appellant. Sears' objection to giving this portion of Instruction No. 3 was overruled by the trial judge.

Instruction No. 3 stated in pertinent part: " * * · * In assessing punitive damages, you are to consider the character of the defendant's act, the nature and extent of the harm to the plaintiff the defendant caused or intended to cause and the wealth of the defendant."

█ It is proper to introduce evidence of a defendant's wealth when punitive damages are requested. And while this court has never held that such proof is mandatory, *Town of Jackson v. Shaw,* Wyo., 569 P.2d 1246, 1255 (1977), we believe that evidence of a defendant's wealth should be introduced when punitive damages are requested. As stated by Dobbs in his treatise on damages, cited with approval by the

Florida Supreme Court in *Rinaldi v. Aaron,* Fla., 314 So.2d 762, 764 (1975):

"The main technique of proof is to explore the defendant's wealth. The existence or nonexistence of the defendant's wealth or financial support is wholly irrelevant when it comes to compensatory damages. But since the purpose of punitive damages is punishment and deterrence, the sum assessed, if it is to be effective at all, must be a sufficiently large one to have effect. A hundred dollar punitive liability may be sufficient punishment for a man of limited means, a hundred thousand dollar punitive liability might be inadequate for a man of great wealth. For these reasons, courts permit the plaintiff claiming punitive damages to introduce evidence showing something of the defendant's financial resources, net worth, for example." Dobbs, Remedies at pp. 218–219.

Not only may the plaintiff introduce evidence as to the wealth of the defendant, but the defendant may also introduce evidence of impecunity in order to mitigate the award of punitive damages. *Rinaldi,* supra, 314 So.2d at 765; Annot., 79 A.L. R.3d 1138.

█ Evidence of a defendant's wealth is important because it is one of three factors that should be considered by the jury when making an award of punitive damages and by the appellate court in reviewing the award. The factors that should be considered are: the nature of the tort; the amount of the actual damages; and the wealth of the defendant. *Indiana & Michigan Electric Company v. Stevenson,* Ind. App., 363 N.E.2d 1254, 1263 (1977). As we stated in *Town of Jackson,* supra, 569 P.2d at 1255:

"[t]he economic status of the defendants is a consideration, as we have indicated, in not wanting to financially ruin the defendants and such evidence is admissible."

Appellee contends that the indirect evidence present at trial was sufficient to present a picture of appellant's wealth. Appellee relies upon the following evidence

to support its claim: appellant's ranch extended for at least six miles along the private road; appellant stated that it would take at least six days to separate the cows from the yearlings after appellee's crew allegedly left the gates open; and appellant owns road–construction equipment which he rents for $50.00 an hour. We do not believe that this evidence standing alone is sufficient to allow the jury to determine appellant's wealth. We agree with appellant that there was no evidence present from which the jury could have considered appellant's wealth.

■ Because there was no evidence presented at trial from which the jury could have determined appellant's wealth, we must consider whether the erroneous instruction amounted to reversible error. This court has frequently held that instructions should not be given on issues that are not supported by the evidence. *Edwards v. Harris*, Wyo., 397 P.2d 87, 90 (1964); *Gilliland v. Rhoads*, Wyo., 539 P.2d 1221, 1231 (1975). This rule has also been applied to elements that are to be considered in awarding damages. *Vangemert v. McCalmon*, 68 Wash.2d 618, 414 P.2d 617, 620 (1966). However, unless it can be shown that the erroneous instruction had some influence upon the verdict, the error is held to be harmless. *Vangemert*, supra, 414 P.2d at 621.

In the case at bar, Sears contends that reversible error was committed because the instruction was

"totally impermissible and inherently prejudicial and could well lead to the extreme overestimation by the jury of the defendant–appellant's wealth and therefore what would be reasonable punishment."

We agree with appellant. Instructing the jury to consider the wealth of appellant without having any evidence in the record to support such an instruction was nothing more than an invitation for the jury to speculate as to appellant's wealth. Such an instruction was inherently prejudicial.

■ The final question is whether the trial judge erred in admitting into evidence the .357 magnum revolver. Appellant contends that the probative value of the evidence was outweighed by the danger of unfair prejudice considering the fact that Sears had admitted he was in possession of the gun during the incident. While we agree with appellant that Rule 403 of the Wyoming Rules of Evidence provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice" we do not believe that the trial judge abused his discretion in admitting the gun.

In *Chism v. Cowan*, Mo., 425 S.W.2d 942, 947 (1967), an action for assault and battery, the court held that the trial judge did not err in admitting the shotgun claimed to have been used by defendant in shooting plaintiff. In so holding, the court rejected defendant's contention that the shotgun was " 'irrelevant, immaterial, prejudicial and inflammatory evidence.' " *Chism*, supra, 425 S.W.2d at 946. Likewise, in *State v. Vasquez*, 83 N.M. 388, 492 P.2d 1005 (1971), a criminal case, the court rejected defendant's contention that the gun admitted into evidence was inflammatory and prejudicial because the state failed to identify the gun as the same one used in the shooting. In so holding, the court stated:

"We fail to see how such introduction was inflammatory and prejudicial since defendant admitted possession of the gun and in using it to twice shoot Mr. Chavez." *Vasquez*, supra, 492 P.2d at 1008.

Appellee contends that the trial judge did not abuse his discretion in admitting the gun because one issue presented at trial was the question of the award of punitive damages. We agree with appellee that the gun was properly admitted as it related to the question of punitive damages. Like the courts in *Chism*, supra, and *Vasquez*, supra, we do not believe that the introduction of the .357 magnum revolver was unduly prejudicial since Sears admitted carrying the gun during the incident.

The case is reversed and remanded for a new trial with respect to the question of

punitive damages against Summit and Sears.