**Paul BELL, Plaintiff-Appellee/Cross-Appellant,**

v.

**Einer MICKELSEN, Defendant-Appellant/Cross-Appellee,**

**Wes Harper, Defendant.**

**Nos. 80–2020, 80–2133.**

United States Court of Appeals, Tenth Circuit.

April 1, 1983.

Rehearing Denied in No. 80–2020 May 10, 1983.

Donald J. Sullivan, Cheyenne, Wyo., for plaintiff-appellee/cross-appellant.

Glenn Parker, Cheyenne, Wyo. (Harold Frederick Buck and James L. Applegate, Cheyenne, Wyo., with him on the brief), of Hirst & Applegate, Cheyenne, Wyo., for defendant-appellant/cross-appellee.

Before DOYLE, McKAY and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Paul Bell, who ran for the office of Sheriff of Platte County, Wyoming, in 1978,

brought this suit under 42 U.S.C. § 1983 (1976) against Einer Mickelsen, the incumbent Sheriff and rival nominee, and Wes Harper, a resident of Platte County. Bell alleged that defendants' actions before, during, and after the elections of that year violated his right to privacy and his right to equal access to the ballot in a state campaign, both secured by the Constitution. He also alleged that their actions deprived him of his federally created right to security as a protected witness under the United States Marshals Service's Witness Security Program. In addition, Bell stated pendent state law tort claims against the defendants for negligence and outrageous conduct arising out of the same series of events. The case was submitted to the jury by special verdict. Based on the jury's answers, the trial court concluded that Bell had waived his section 1983 claims, and awarded him actual and punitive damages on the tort claims.

Mickelsen appeals. He argues that the trial judge erred in submitting the issues of punitive damages to the jury, and contests the section 1983 and tort claims generally. Bell cross appeals, arguing that the court erred in interpreting the jury's findings relating to waiver, and by reducing and apportioning the jury's award on the tort claims. We affirm in part and reverse in part.

## I.

### BACKGROUND

The facts were contested vigorously at trial, and the parties on appeal have seized the opportunity to renew their factual arguments, most of which are completely irrelevant to the issues before us. We review the evidence in the light most favorable to the verdict, resolving any factual conflicts to support the jury's findings. *Gardner v. General Motors Corp.*, 507 F.2d 525, 527 (10th Cir.1974).

Although this lawsuit arose in Wyoming, the story begins in the Midwest. The plaintiff, Paul Bell, was born Paul Martin. In 1974, Martin was approached to join a drug-smuggling operation. He contacted federal law enforcement officials, and became an undercover agent for the Drug Enforcement Agency. Subsequently, the federal authorities raided the operation, and, at trial in Georgia in 1975, its members were convicted. Martin was the principal witness for the government. Prior to trial, Martin had been informed by Eldon Thompson, one of the defendants, that another defendant, Peter Davis, had put out a contract for the life of the then-undisclosed informant. An undercover agent had confirmed this information.

Because of the danger, Martin was taken into the United States Marshals Service's Witness Security Program. Martin and his family were moved to Des Moines, Iowa, given a legal name change to Bell, and provided with a fictional background identity. At that point, Paul Martin ceased to exist, and Paul Bell's story began.

In 1976, Bell removed himself and his family from the active protection of the Witness Security Program, and moved to Platte County, Wyoming. In 1978, he ran for County Sheriff using his new identity and federally provided background. At about that time, the incumbent sheriff, defendant Einer Mickelsen, aware of inconsistencies in Bell's asserted background, began compiling a dossier on him. Using his office as Sheriff, he obtained information from and through the local United States Marshals and Federal Bureau of Investigation offices. Mickelsen was joined by defendant Wes Harper, a resident of Platte County, in his efforts to discover Bell's true background.

In October of 1978, Harper went to the Midwest to follow leads obtained by Mickelsen through the federal law enforcement agencies and other sources. Mickelsen issued Harper a Deputy Sheriff's identification card for the trip. During the trip, Harper talked with various law enforcement officers, using the provided credentials and identifying himself as a deputy sheriff. In particular, Harper met with Deputy United States Marshal Dean Yeager, who had been in charge of Bell's protec-

tion in Des Moines. Harper told the Marshal that he, Harper, was going to Danville, Illinois, to "take whoever was interested over there back to Wyoming and show them Paul Bell's house." Rec., vol. III, at 395. At that time, both Harper and the Marshal knew that Eldon Thompson, who had been convicted of drug violations as a result of Bell's/Martin's testimony, was out of prison on appeal bond and living in Danville. Harper subsequently went to Danville and met with Thompson. On his return to Wyoming, he conferred with Mickelsen concerning the information he had obtained and was reimbursed several hundred dollars by Mickelsen for expenses.

After his meeting with Harper, Yeager alerted the Witness Security Program that Bell might be in danger.[1] The Marshals Service again relocated Bell and his family, removing them from Platte County. Mickelsen subsequently won the general election by a narrow margin.

Following the election, Mickelsen continued his activities concerning Bell, even though he knew that Bell was under the protection of the Witness Security Program and believed that Eldon Thompson and Peter Davis posed a threat to Bell. In December, Peter Davis flew into the county airport, where he was picked up by Sheriff Mickelsen and given a ride into town. Mickelsen then met with both Davis and Harper concerning Paul Bell. Davis was ostensibly seeking Bell to obtain information to be used in appealing his conviction. Davis set out with Harper, who was issued a new set of credentials by Mickelsen, to locate Bell. At the conclusion of this trip, Harper was paid several thousand dollars by Davis. Harper met with Mickelsen to discuss the fruitless search, and then continued trying to learn Bell's whereabouts, ceasing his efforts only when the present action was filed. When the trial began, Bell was living in an undisclosed area and

1. Bell had been warned previously that running for political office might jeopardize his security

was employed at a GS–12 rating in a government law enforcement service.

## II.

### SECTION 1983 CLAIMS

Bell asserted three claims under 42 U.S.C. § 1983: first, that he was denied his right under the United States Constitution to have equal access to the state political process; second, that he was denied his constitutional right to privacy; and third, that Mickelsen's and Harper's actions deprived him of his rights to security arising under the federal Witness Security Program.

The jury's findings on Bell's section 1983 claims were as follows:

"Q1. Do you find by a preponderance of the evidence that either of the Defendants violated the Plaintiff's civil rights?

| | YES | NO |
|---|---|---|
| A1. Einer Mickelsen | X | |
| Wes Harper | X | |

If your answer is 'No' as to *all* parties, proceed to question fig. 5.

Q2. If so, was such violation of Plaintiff's civil rights either wholly or partially a proximate cause of the damages, if any, claimed by Plaintiff?

| A2. | YES | NO |
|---|---|---|
| Einer Mickelsen | X | |
| Wes Harper | X | |

Q3. Did the Plaintiff, in offering himself as a candidate for elective office, or otherwise, by his actions, waive or intentionally relinquish any of his constitutional rights protected by the United States Constitution or federal statutes and which you have found were violated by the Defendants or either of them?

| A3. | YES | NO |
|---|---|---|
| | X | |

Q4. If you have answered 'Yes' to Questions 1 and 2, what sum, if any, do you deem fair and just to compensate the plaintiff for the losses he actually sustained?

cover.

A4.                  500.00 MICKELSEN
      Actual Damages: $ 500.00 HARPER
                      5000.00 MICKELSEN
      Punitive Damages:$ 5000.00 HARPER     "

Rec., vol. I, at 214–15 (emphasis in original).[2]

Notwithstanding the jury's finding of civil rights violations and its award of damages against both Mickelsen and Harper, the trial court concluded that the jury's finding of waiver covered all of the rights claimed by Bell under section 1983. Consequently, the court did not award Bell damages for these claims.

Bell argues on appeal that the district court erred in failing to award damages for the section 1983 claims. Specifically, he argues that the jury's answer on waiver, when combined with its award of damages, indicates the jury found that Bell had not waived all three of the claims pressed under section 1983, but only one or at most two of them. Mickelsen argues both that Bell had only one section 1983 claim, a contention that we reject summarily,[3] and that the trial court correctly interpreted the special verdict as a jury finding that Bell had waived all of his rights asserted under section 1983.

■■ The jury clearly found that Bell's civil rights were violated and also that a waiver had occurred. It is impossible to determine whether the jury believed that the waiver was effective as to all or only some of Bell's section 1983 claims. However, that determination is unnecessary. Because of ambiguities in the jury instructions and the special verdict questions, to which no objections were raised below, we hold that the issue was not preserved for appeal.

The trial court gave the jury two instructions on waiver. After defining the constitutional right of privacy, the court instructed the jury:

"[T]he right of privacy guaranteed under the Fourteenth Amendment is not absolute. The rights of every person to be left alone must be placed in the scales with the right of others under the First Amendment to communication. When a party voluntarily enters public life, he surrenders some of the privacy secured by law for those who elect not to place themselves in the public spotlight.

"It is for you to determine whether the plaintiff in this instance, by electing to run for Sheriff of Platte County, Wyoming, voluntarily waived any right that he might have had to the privacy of his prior identity."

Rec., vol. VI, at 1118–19. The court then instructed the jury on Bell's Witness Security Program claim, and told the jury that it had to determine whether Bell was within the program at the time the action arose, and, if so, whether the defendants had violated any of Bell's rights under the program. The court went on to say:

"It is the contention of the defendants that the plaintiff waived any rights he might have had to confidentiality under the Marshal Security Program by electing to run for public office or by waiver of his rights under the program. A party may waive rights guaranteed to him under the United States Constitution.

"A waiver is defined as an intentional relinquishment of a known right or privilege. The determination of whether or not there has been an intelligent waiver of a constitutionally protected right depends in each case upon facts and circumstances surrounding the case."

*Id.* at 1120.

These jury instructions are ambiguous because the jury could have understood them to mean either that a waiver of one of Bell's claimed rights necessarily was effective as a waiver of the other rights asserted, or that Bell could waive one of his

---

**2.** The answers, amounts, and names were filled in by the jury in handwriting.

**3.** The record is replete with references to Bell's three section 1983 claims, and the jury was instructed on all three. Because of our disposition of the waiver issue, we need not decide whether each of the alleged section 1983 claims was properly asserted as such.

claimed rights without thereby waiving the others.

The waiver issue was further confused by the trial court's subsequent admonition that "[i]f you find that plaintiff was deprived of any of his civil rights by the defendants acting under color of state law, you *must* return an award for that element, regardless of your other findings on damages." *Id.* at 1127 (emphasis added). The jury was never instructed that if it found Bell had waived all of his asserted rights, it should not award damages; rather, from the last passage we have quoted, the jury could easily have believed that it should award damages whether or not it found waiver. These ambiguities should have been rectified at trial.

The Federal Rules of Civil Procedure require a party to bring such ambiguities to the trial court's attention. "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Fed.R.Civ.P. 51. Bell's counsel did not bring these ambiguities to the attention of the district court. When the court reviewed the prospective instructions and the special verdict with counsel, Bell's attorney discussed one of the waiver instructions, but neither raised any concerns about vagueness nor objected to the court's choice of words. *See* Rec., vol. VI, at 1070. No objection was made in open court. Bell failed to raise this issue before the trial court, and is thereby responsible in part for the issue on appeal. "The purpose of Rule 51 is to prevent a litigant from taking advantage of an error which could be rectified by the court if called to its attention by timely and specific objection." *Corriz v. Naranjo*, 667 F.2d 892, 896 (10th Cir.1981) (citing *Taylor v. Denver & Rio Grande Western Railroad*, 438 F.2d 351, 353 (10th Cir.1971)), *cert. dismissed,* —— U.S. ——, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982).

It is equally clear that the patent ambiguity in the special verdict question was not addressed. During a conference, Bell's attorney suggested that Special Verdict Question 3 "should inquire whether the plaintiff waived the Constitutional rights, if any, which the jury found to have been violated." Rec., vol. VI, at 1066. The court proposed that the question be changed to read "rights protected by the Constitution or civil rights statute and which you have found were violated by the defendants or either of them." *Id.* Bell's counsel agreed. Thus, counsel was at least partially responsible for the form of the question actually submitted to the jury. When the jury's verdict was returned, Bell's counsel raised no question concerning the meaning of the jury's finding of waiver and its concomitant award of damages.

■ The requirement that the trial court be given an opportunity to analyze and correct an alleged error is equally applicable to special verdicts submitted under Rule 49(a). A party's failure to object to a special verdict question at trial is a waiver of the right to protest on appeal. *Fredonia Broadcasting Corp. v. RCA Corp.*, 481 F.2d 781, 796 (5th Cir.1973); *see Charles Stores, Inc. v. Aetna Insurance Co.*, 490 F.2d 64, 67–68 (5th Cir.1974); *Bayamon Thom McAn, Inc. v. Miranda*, 409 F.2d 968, 973 (1st Cir.1969); *Frankel v. Burke's Excavating, Inc.*, 397 F.2d 167, 170 (3d Cir.1968); *see also Skillin v. Kimball*, 643 F.2d 19 (1st Cir.1981) (failure to raise alleged inconsistencies in jury's responses to special jury questions before the jury is dismissed precludes their consideration on appeal). Accordingly, we hold that the issue was not preserved for review.

### III.

### THE TORT CLAIMS

The jury was instructed on the tort of outrageous conduct, and the tort of negligence. In response to separate questions on the special verdict form, the jury found that both Mickelsen and Harper had engaged in outrageous conduct causing damage to Bell, and that the defendants had acted negligently, also to Bell's detriment. The jury then was asked:

"Q11. What sum of money do you deem fair and just to compensate the Plaintiff for the losses he actually sustained as a result of the Defendants' negligence *or* outrageous conduct?"

Rec., vol. I, at 217 (emphasis added). It responded:

"A11.

| | | |
|---|---|---|
| | 5000.00 | MICKELSEN |
| Actual Damages – – – | $ 5000.00 | HARPER |
| | 25,000.00 | MICKELSEN |
| Punitive Damages – – | $25,000.00 | HARPER   " |

*Id.* [4]

The jury was also instructed on the theory of comparative negligence, and returned a verdict apportioning negligence between the parties as follows: Bell, thirty percent; Mickelsen and Harper, each thirty-five percent. The trial court applied the comparative negligence percentages to the actual damages found by the jury and entered judgment against Mickelsen and Harper each for $3,500 actual damages plus $25,000 punitive damages.

Bell and Mickelsen each contested the court's judgment in motions to amend, and both renew their contentions on appeal. Bell argues that the court erred by reducing the amount of the verdict on the intentional tort of outrageous conduct by the percentage of comparative negligence allocated to him under the negligence cause of action, and also by apportioning the actual damages awarded by the jury. Mickelsen argues that the trial court erred by submitting and awarding punitive damages.

### A.  Actual Damages

1. Comparative Negligence and Intentional Tort.

■ The trial court made clear its belief that separate damages and hence a double recovery could not be awarded for both a finding of negligence and of an intentional tort. We agree that the damages caused by the defendants' negligence and their intentional wrongful conduct were unitary. The jury's award of actual damages thus represents an award for harm caused by the intentional tort. Nevertheless, the trial court reduced the actual damages award by the percentage of comparative negligence assigned by the jury to Bell. The court had stated in conference that "it's my theory that the tort of outrage is a tort and so is ordinary negligence, so therefore, the comparative negligence law, I believe, applies to both." Rec., vol. VI, at 1065. Bell argues that the court incorrectly reduced the intentional tort damages by the percentage of comparative negligence. We agree.

Wyoming has adopted the comparative negligence doctrine by statute. The statute provides that "[a]ny damages allowed [in an action to recover damages for negligence] shall be diminished in proportion to the amount of negligence attributed to the person recovering." Wyo.Stat. § 1–1–109(a) (1977). The Wyoming Supreme Court has construed this statute as applicable only to awards for negligence: "§ 1–1–109 does not mandate reduction of damages on the basis of comparative negligence of the plaintiff if defendant's misconduct is willful and wanton. . . . Damages resulting from willful and wanton misconduct are not 'damages for negligence' as that term is used in § 1–1–109." *Danculovich v. Brown,* 593 P.2d 187, 194 (Wyo.1979). In that case, involving an award for "willful and wanton misconduct," the court noted that a comparative negligence apportionment "does not concern the difference in the kind of conduct which distinguishes negligence from willful and wanton misconduct. Willful and wanton misconduct, in the strict sense, is not negligence, since it involves intent rather than inadvertence, and is positive rather than negative." *Id.* at 193. We believe that the court's analysis and distinction is equally applicable in a case involving damages for the intentional tort of outrageous conduct. Accordingly, we hold that the trial court erred in reducing damages on the basis of Bell's comparative negligence.

### 2.  The Amount of Actual Damages

The jury entered actual damages on the special verdict form against each defendant

---

4. *See supra* note 1.

in equal amounts. Thus, it must be determined whether the jury intended to award Bell the sum of amounts entered and was indicating its belief that the defendants were each responsible for one-half of the harm suffered, or whether the jury intended that Bell be awarded only the amount entered against both defendants and was indicating its belief that Bell and Harper were jointly and severally liable for that amount. In the first instance, given our conclusion on the issue of comparative negligence, Bell would be entitled to $10,000 actual damages; in the second, $5,000.

The trial court concluded that the jury intended both to award Bell the sum of the amounts entered, $10,000, and to apportion that amount equally between Mickelsen and Harper. Judgment was entered accordingly. The court did not indicate that it was holding the defendants jointly and severally liable for the sum of $5,000 damages, as defendant Mickelsen apparently believes, *see* Mickelsen Reply Brief at 2. Rather, the court specifically entered separate damage awards against each defendant. Rec., vol. I, at 234.

It is difficult to determine the jury's actual intentions in responding to Special Verdict Question 11 as it did. In the negligence instructions, the jury was charged:

"[I]t is your duty to determine only two things: the amount of damages . . . and the percentage of negligence, if any, attributable to [Bell]. It is the function of the Court to apply the percentages of negligence, . . . if any, to the damages, if any. . . . [Y]ou are not to take into account the effect of any percentages of negligence of any party in determining their damages. . . . "

Rec., vol. VI, at 1124–25. In the intentional tort instructions, the jury was directed to "determine what amount of money damages would be returned." *Id.* at 1127. In a punitive damages instruction, the court indicated that punitive damages could be awarded separately against either defendant. Quoting the special verdict form, the court instructed the jury that " '[t]he damages awarded in Q 11 should be determined regardless of any percentages you find in your answer to Q 12 [the comparative negligence question].' " *Id.* at 1139.

At this point in the trial, the jury was sequestered and Mickelsen's attorney suggested punitive damages should be separately designated between the defendants. The court agreed, and proposed additional instructions to which counsel agreed. When the jury returned, the court instructed them as follows:

"As to Question 4 and 11 which relate to damage issues, if the jury should find that the plaintiff is entitled in those two questions to punitive damages, I would like you to add, your foreman should add below as for which defendants. In other words, there is a possibility that you might find the actions of one defendant were such as to entitle the plaintiff to punitive damages, but the actions of the other defendant didn't, so as to those beneath the words 'Punitive Damages,' dollar sign, blank line, your foreman can add against both defendants or against whichever one you feel that it might be if you selected only one."

*Id.* at 1144.

■ Although the jury was directed to segregate by defendant only punitive damages, it nevertheless subsequently entered both actual and punitive damages against each defendant in the manner suggested by the court. The trial judge evidently inferred that the jury confused the procedures they were instructed to follow in designating punitive and actual damages and, as a result, entered the amount of damages they felt the two defendants were personally responsible for in both categories. This conclusion is reinforced by the jury's identical alteration of the special verdict form when entering actual and punitive damages. We cannot say that the court's understanding of the jury's intent is wrong as a matter of law.

3. Apportionment

■ Having decided that the jury intended to award a total of $10,000 in actual damages to Bell, however, the trial court

then held that the amount should be apportioned between the two defendants, with each liable for only $5000. We disagree with this result. The Wyoming Supreme Court has declared that "in a case which involves an injury that is not divisible, apportionment . . . cannot rationally be applied." *Chrysler Corp. v. Todorovich,* 580 P.2d 1123, 1130 (Wyo.1978). In the case before us, the harm done Bell was the result of the joint efforts of Mickelsen and Harper. Their concerted efforts drove him and his family from their Wheatland home, and possibly endangered their lives. The defendants' conduct unconscionably invaded Bell's life under the guise of political inquiry. The injuries done Bell "are incapable of any logical, reasonable, or practical division." *Id.* at 1131. In these circumstances, the trial court erred in apportioning damages rather than holding the defendants jointly and severally liable.

Our conclusion is bolstered by a Wyoming statute which provides that "[t]here is no right of contribution in favor of any tortfeasor who has intentionally, willfully or wantonly caused or contributed to the injury" of another person. Wyo.Stat. § 1–1–110(c) (1977); *see Danculovich v. Brown,* 593 P.2d 187, 193 n. 9 (Wyo.1979). Because the actual damages award represents damages for the intentional tort of outrageous conduct, an issue that we have already addressed, the trial court's apportionment is erroneous, working as it does to effect a right of contribution between the defendants.

### B.  Punitive Damages

■ Mickelsen argues the trial court erred in submitting the issue of punitive damages to the jury. He asserts that he is entitled as a matter of law to "good faith immunity" under *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), and thus is immune against any finding of willfulness or wantonness, a prerequisite to a punitive damages award under Wyoming law. We find Mickelsen's argument specious. *Procunier* held that prison officials, acting in good faith, were not liable in a section 1983 action for the violation of a constitutional right that had not at the time been "authoritatively declared." *See Baker v. McCollan,* 443 U.S. 137, 138–39, 99 S.Ct. 2689, 2691–92, 61 L.Ed.2d 433 (1979). In our case, punitive damages were awarded under Wyoming tort law for Mickelsen's and Harper's willful and wanton actions. While the good faith immunity doctrine is applicable to section 1983 actions, Wyoming has not applied it in intentional tort actions brought under state law. The punitive damage issue was properly submitted to the jury.

■ Mickelsen also argues that the trial court erred in instructing the jury on punitive damages when there was no evidence of defendants' wealth offered at trial. We need not linger over this argument. The Wyoming Supreme Court has explicitly stated that "this court has never held that . . . proof [of a defendant's wealth] is mandatory" when punitive damages are requested. *Sears v. Summit, Inc.,* 616 P.2d 765, 772 (Wyo.1980). The court's further statement that "we believe that evidence of a defendant's wealth should be introduced," *id.,* is admonitory only; such evidence "is important because it is one of three factors that should be considered by the jury," *id.* Where, as here, no jury instruction was given to consider defendants' wealth, the lack of evidence of wealth is not harmful.

We have considered the other arguments made by the parties and find them unpersuasive. The decision of the trial court is affirmed in part, reversed in part, and remanded for entry of judgment in the amount of $10,000 actual damages jointly and severally against Mickelsen and Harper plus $25,000 punitive damages against each defendant.