384 S.E.2d 857

**MELBOURNE BROTHERS CONSTRUCTION CO.**

v.

**The PIONEER CO. and Dean E. Lewis and the Department of Highways, et al.**

**No. 18442.**

Supreme Court of Appeals of West Virginia.

July 24, 1989.

Rudolph L. DiTrapano, Joshua I. Barrett, DiTrapano & Jackson, Charleston, for Pioneer Co., Dean E. Lewis.

Michael T. Chaney, Michael Bonasso, Kay, Casto & Chaney, Charleston, for Melbourne Bros. Const.

Robert Bible, Anthony Halkias, Legal Div., Dept. of Highways, Charleston, for Dept. of Highways.

PER CURIAM:

This case arises out of the efforts of the Department of Highways (the Department), and its contractor, Melbourne Brothers Construction Co. (Melbourne), to stabilize and repair one of the piers supporting the I-64 bridge between South Charleston and Dunbar, West Virginia. The appellants, The Pioneer Co. (Pioneer), owner of Wilson Island, and Dean Lewis, President of Pioneer, seek relief from a judgment of $346,642.22 entered against them for interfering with the performance of Melbourne's contract with the Department of Highways. On appeal, the appellants contend that the trial court erred in finding that the deed between the Department and Pioneer allowed the Department to use Wilson Island to repair one of the piers of the bridge. We have reviewed the record and disagree; therefore, we affirm.[1]

Pioneer is the owner of Wilson Island, which is located in the Kanawha River between South Charleston and Dunbar. In late 1969, the Department contacted Pioneer about upcoming construction of an interstate bridge. The Department wanted to purchase property on Wilson Island to place four bridge piers and to acquire an aerial easement over Wilson Island. In May, 1970, Pioneer granted the necessary rights and easements, and the Department built the I-64 bridge. The deed provided for the construction of four piers on land acquired from Pioneer. A fifth pier, Pier No. 8, was totally surrounded by water and was located between the pool stage and the low water mark of the Kanawha River.

After the bridge construction, Pioneer began to place fill material against Pier No. 8. Apparently, Pioneer was attempting to build up its island. As a result of the stress of the fill, Pier No. 8 began to lean toward the Kanawha River. Because this condition was extremely hazardous, the Department sought and accepted bids from contractors to repair Pier No. 8. The project required the building and excavation of a cofferdam[2] and the placement of a massive concrete stabilizing boot at the base of the pier. The bidding sheet reported that the Department's right-of-way did not include access to the island via a bridge owned by the appellants. Contractors were told that access could be gained only by permission from the property owner to use the bridge or by use of the river.

In April, 1978, Melbourne was awarded the contract. Soon thereafter, John Forren, a superintendent for Melbourne, contacted Dean Lewis to see if he would allow Melbourne employees to use the Wilson bridge. Lewis advised Forren "... that $50,000 would make this job go real smooth." Instead of succumbing to the $50,000.00 demand, Forren decided to gain access to the pier by the river.

On June 15, 1978, Melbourne approached Wilson Island from the South Charleston side of the river. At the island, Melbourne unloaded an end loader and placed it under the bridge next to Pier No. 8. The following day, when Melbourne employees returned to the island, the end loader was gone. Melbourne soon learned that Pioneer employees had confiscated the end loader at Dean Lewis' direction, and that Mr. Lewis would not return it until Mel-

---

1. The Department of Highways argues that this proceeding is barred by res judicata because of our decision in *West Virginia Dept. of Highways v. The Pioneer Co.,* 170 W.Va. 370, 294 S.E.2d 173 (1982). We disagree. *See Conley v. Spillers,* 171 W.Va. 584, 301 S.E.2d 216 (1983).

2. A cofferdam is a "watertight enclosure from which water is pumped to expose the bottom of a body of water and permit construction (as of a pier)." *Webster's New Collegiate Dictionary,* p. 217 (3d 1975).

bourne signed a release. Melbourne signed a release on June 29, 1978.[3]

On June 30, 1978, the Department filed a condemnation action in the Circuit Court of Kanawha County. At a hearing on July 13, 1978, the trial court ruled that the Department had the right to repair Pier No. 8 pursuant to the terms of the original condemnation deed. A written order to this effect was filed on July 26, 1978.

On July 31, 1978, Melbourne attempted to resume work on the pier. As Melbourne employees approached Wilson Island, they discovered that Pioneer employees had placed equipment around Pier No. 8, thereby blocking access to the work site. Melbourne complained to the Department, and the following day Melbourne was able to begin construction. However, on August 2, 1978, Pioneer once again blocked access to the work area.

Utterly frustrated, Melbourne filed this action in the Circuit Court of Kanawha County. Melbourne sought a preliminary injunction and compensatory damages for tortious interference with a contract. On August 7, 1978, the trial court granted the preliminary injunction.

On August 8, 1978, Melbourne returned to work on the bridge project and continued without any further intereference by Pioneer. By December 8, 1978, Melbourne had completed constructing and excavating the cofferdam. At this point, pursuant to the contract, the Department had to inspect the work before anything else could be done. Unfortunately, the Kanawha River flooded the work area; consequently, the Department was unable to inspect the cofferdam until December 26, 1978. During the next several months high water prevented completion of the work approximately a dozen times. Because of these natural events, Melbourne could not pour the concrete footer until April 16, 1979.

At trial, Melbourne sought damages for two separate time periods: (1) the thirty-eight working days lost between June 15, 1978, and August 8, 1978; and (2) the eighty working days lost when the job was forced into winter and the project was further delayed. The project was originally scheduled to be completed on December 15, 1978. Because of the delays during the summer, the project was forced into the winter months. During the winter the Kanawha River frequently flooded and Melbourne could not work; on each occasion Melbourne was forced to excavate the cofferdam. Moreover, during this period Melbourne was required to leave both a skeleton crew and equipment on the work site.

Finally, because the project was not completed on time, Melbourne was assessed a $18,450.00 penalty by the Department. The jury returned a verdict for Melbourne for $210,241.09, the total compensation requested. The trial court also awarded Melbourne $136,401.13 as prejudgment interest. The total judgment assessed against Pioneer was $346,642.22.

Pioneer's primary contention on appeal is that the 1970 deed did not give the Department the right to go onto Wilson Island to repair Pier No. 8; thus, Melbourne was trespassing. The trial court ruled that the

---

**3.** The release provided as follows:

AGREEMENT

This Agreement made and entered into this 29 day of June, 1978, by and between MELBOURNE BROS. CONSTRUCTION CO., a corporation, and THE PIONEER COMPANY, a corporation, hereinafter respectively referred to as Melbourne and Pioneer:

WHEREAS, on the 15th day of June, 1978, Melbourne did willfully and wantonly trespass and cause damage on certain property of Pioneer known as "Wilson Island", Union District, Kanawha County, West Virginia; and

WHEREAS, Pioneer seized a certain Caterpillar End Loader used by Melbourne in said trespass and left on Pioneer's property.

NOW THEREFORE, this agreement witnesseth that for and in consideration of the premises, the parties do hereby covenant and agree as follows:

1. Melbourne agrees to refrain from any further trespass or violation of the boundaries of the property of Pioneer.

2. Upon execution of this agreement, Pioneer agrees to release to Melbourne the Caterpillar End Loader seized as aforesaid.

3. Melbourne and Pioneer each release the other of and from any and all claims, demands, actions and causes of action arising from and connected with the events referred to hereinabove.

deed did give the Department and its contractor such a right.

■ In syllabus point 1 of *Cotiga Development Co. v. United Fuel Gas Co.,* 147 W.Va. 484, 128 S.E.2d 626 (1962), we explained:

> A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent.

*See Sally–Mike Properties v. Yokum,* 175 W.Va. 296, 332 S.E.2d 597 (1985). *See also, McDonough Co. v. E.I. DuPont De-Nemours & Co., Inc.,* 167 W.Va. 611, 280 S.E.2d 246 (1981); *Davis v. Hardman,* 148 W.Va. 82, 133 S.E.2d 77 (1963); *Tate v. United Fuel Gas Co.,* 137 W.Va. 272, 71 S.E.2d 65 (1952). The deed in question has the following provision:

> It is understood that the real estate herein described shall be used for or in connection with the construction, maintenance, and use of a controlled-access facility (freeway) with no rights of access to said facility by abutting owners. For the above recited consideration, Grantor ... releases unto Grantee *all easements of way, over, upon, through, across or under said land herein described, specifically including but not limited to all rights of vehicular and pedestrian access; and all rights of ingress to and egress from said property and the land herein described.* (Emphasis added.)

We find no patent ambiguity in this language. The Department had a right-of-way to repair and maintain the bridge structure, and rights of ingress and egress to Wilson Island for those purposes.[4]

The appellants further assert that they are entitled to a directed verdict because Melbourne signed an agreement releasing Pioneer from any claims arising from the bridge project.[5] Specifically, Pioneer asserts that the language in the release—"arising from or connected with the events referred to"—clearly releases Pioneer from any claims for the project.

In syllabus point 1 of *Jividen v. Legg,* 161 W.Va. 769, 245 S.E.2d 835 (1978), we held:

> "Upon a motion to direct a verdict for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence. Syllabus, *Nichols v. Raleigh–Wyoming Coal Co.,* 112 W.Va. 85, 163 S.E. 767." Point 1, Syllabus, *Jenkins v. Chatterton,* 143 W.Va. 250, 100 S.E.2d 808 (1957).

■ The appellee presented evidence that the release was signed by Melbourne under duress, i.e. while its end loader was unlawfully detained by Pioneer. The trial court was bound to favorably consider this evidence when ruling on appellant's motion for a directed verdict; thus its denial of that motion was not improper.[6]

---

**4.** In the alternative, Pioneer argues that even if it was incorrect regarding the property rights, it acted in good faith and therefore should not be held liable for damages. The jury was instructed on good faith, and apparently found against Pioneer on this factual issue.

**5.** *See* footnote 3 for the entire text of the agreement signed between Melbourne and Pioneer.

**6.** "Whether duress exists in a particular transaction presents a question of fact for the jury." *Carroll v. Fetty,* 121 W.Va. 215, 220, 2 S.E.2d 521, 524, *cert. denied,* 308 U.S. 571, 60 S.Ct. 85, 84 L.Ed. 479 (1939).

Appellant also complains of the lack of a jury instruction that would require evidence of duress to be proved by clear and convincing evidence. *Carroll v. Fetty,* 121 W.Va. at 220, 2 S.E.2d at 524. While we agree that such an instruction was in order, we decline to disturb the jury's verdict. Appellant has offered no legal justification for Pioneer's seizure of the end loader. Indeed, even if Pioneer were correct as to its property rights, and the end loader was a trespassing chattel, Pioneer was only privileged to exercise as much dominion and control over the machine as was necessary to remove it from Pioneer's land. Restatement of Torts 2d § 260(1) (1965). For a recent application of this well settled rule, *see Sears v. Summit,* 616 P.2d 765 (Wyo.1980), *overruled on other grounds, Adel v. Parkhurst,* 681 P.2d 886 (Wyo.1984).

In light of the strong evidence that Pioneer exacted the release through a wholly unlawful demand, any error in failing to instruct the jury

 Pioneer further contends that the trial court erred in allowing Melbourne to recover lost profits and overhead because these were speculative, and did not reflect the plaintiff's actual losses. "Loss of profits may be recoverable in tort actions." *Hardman Trucking, Inc. v. Poling Trucking Co., Inc.*, 176 W.Va. 575, 579, 346 S.E.2d 551, 555 (1986). However, this Court has established stringent prerequisites to such recovery. In syllabus point 2 of *Ohio–West Virginia Co. v. Chesapeake & Ohio Railroad Co.*, 97 W.Va. 61, 124 S.E. 587 (1924), we held:

> In order to recover for loss of profits as the result of a tort, they must be such as would be expected to follow naturally the wrongful act, and are certain both in their nature and the cause from which they proceed.

Moreover, the loss of profits must be established with reasonable certainty and not be speculative or conjectural in character or amount. *Franklin v. Pence*, 128 W.Va. 353, 36 S.E.2d 505 (1945). "Thus no recovery can be had for loss of profits where it is uncertain whether any profit at all would have been made by the plaintiff." 22 Am. Jur.2d Damages § 625 (1988).

In the instant case, Melbourne used a formula approved by the Department for calculating profit and overhead. Although this evidence established the amount of profits Melbourne could have made had it been working on another project for the Department, there was no evidence that Melbourne had such an opportunity.

 Upon reviewing the trial record, we believe that the evidence was insufficient to present the issue of lost profits and overhead to the jury; thus, it was error for the trial court to award Melbourne $17,-246.21 reflecting these speculative losses. Accordingly, the judgment order of the Circuit Court of Kanawha County is affirmed in part, reversed in part, and remanded with directions that the trial court enter a judgment order of $192,994.88 plus prejudgment interest.[7]

Justice McHugh and Justice Workman, deeming themselves disqualified, did not participate in the consideration or decision of this case.

Affirmed in part; reversed in part; and remanded with directions.

---

as to the heightened burden of proof necessary to prove duress was harmless. *See* W.Va.Civ.P. Rule 61.

**7.** Pioneer also assigns as error the following: The Court Erred in Refusing to Allow the Jury to Consider the Sworn Statements Made By Melbourne's President in the Court of Claims Alleging That the State Was Responsible for the Delay.

Although the trial court refused to allow the appellants to admit into evidence a verified complaint filed in the Court of Claims against the Department by Melbourne, the trial court did allow admission of a letter from the president of Melbourne, dated March 5, 1979, to the Department. In the March 5, 1979, correspondence, Melbourne's president blamed the Department for the delays in completing the project. If it was error for the trial court to refuse to admit the verified complaint into evidence, it was harmless error and does not serve as a basis for setting aside the jury verdict. *See* W.Va.R.C.P. Rule 61.