IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

**FILED**

**June 10, 2016**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 15-0122

RUBIN RESOURCES, INC.,
Plaintiff Below, Petitioner

v.

GAROLD "GARY" W. MORRIS, II,
Defendant Below, Respondent

Appeal from the Circuit Court of Lewis County
The Honorable John L. Henning, Judge
Civil Action No. 13-C-64

REVERSED AND REMANDED

Submitted:  March 2, 2016
Filed:  June 10, 2016

David Allen Barnette, Esq.
Vivian H. Basdekis, Esq.
JACKSON KELLY, PLLC
Charleston, West Virginia
Attorneys for Petitioner

David D. Johnson, III, Esq.
Winter & Johnson PLLC
Charleston, West Virginia
Attorney for Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

2. "'Generally, in a suit against an attorney for negligence, the plaintiff must prove three things in order to recover: (1) the attorney's employment; (2) his/her neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the plaintiff.' Syl. Pt. 1, *Calvert v. Scharf,* 217 W.Va. 684, 619 S.E.2d 197 (2005)." Syl. Pt. 1, *Humphries v. Detch*, 227 W.Va. 627, 712 S.E.2d 795 (2011).

3. "Damages arising from the negligence of an attorney are not presumed, and a plaintiff in a malpractice action has the burden of proving both his loss and its causal connection to the attorney's negligence." Syl. Pt. 3, *Keister v. Talbott*, 182 W.Va. 745, 391 S.E.2d 895 (1990).

4. A plaintiff in a legal malpractice action has a general duty to mitigate his or her damages. This doctrine requires a plaintiff to take reasonable steps within his or her ability to minimize losses caused by the attorney's negligence. However, a plaintiff is not required to take actions which are impractical, disproportionately expensive, or likely futile. The scope of a plaintiff's duty to mitigate damages depends on the particular facts of the case.

Workman, Justice:

In this legal malpractice action, Petitioner Rubin Resources, Inc. ("Rubin"), filed suit asserting that Respondent Garold "Gary" W. Morris, II ("Mr. Morris") was negligent in performing a title examination and preparing a title opinion for Rubin regarding an oil and gas leasehold, and that as a direct result of that negligence, Rubin incurred monetary damages totaling $278,455. Mr. Morris admitted that he was negligent in performing the title examination and preparing the title opinion, but he contested his liability for the damages claimed by Rubin. Following discovery, the parties filed cross-motions for summary judgment. After considering arguments on the motions, the Circuit Court of Lewis County, West Virginia, granted summary judgment in favor of Mr. Morris and awarded Rubin no damages.

On appeal to this Court, Rubin argues it is entitled to summary judgment because the undisputed facts demonstrate Mr. Morris's professional negligence was the proximate cause of the damages at issue. Upon review of the parties' briefs and oral arguments, the appendix record, and the pertinent authorities, we conclude that Rubin's arguments have merit. We therefore reverse the judgment of the circuit court and remand with instructions to enter summary judgment in favor of Rubin.

1

## I.  FACTUAL AND PROCEDURAL HISTORY

Since it organized in 1983, Rubin has been engaged in the oil and gas production industry. In 2000, Rubin entered into an agreement with Jackson L. Smith Enterprises, Inc., dba West Virginia Energies ("WVE"), to purchase WVE's interest in the leasehold estate of a 120-acre tract of land in Ritchie County, West Virginia, for the consideration of $5,000 plus royalties. The agreement between Rubin and WVE provided, in relevant part, that Rubin would procure a title examination concerning the tract; and, in the event it was determined that WVE did not hold good and marketable title to the leasehold estate, WVE would substitute other property acceptable to Rubin. The agreement provided the following substitution clause:

> For and upon receipt of Five Thousand ($5,000.00) from [Rubin] as payment for the leasehold estate(s) . . ., [WVE] hereby agrees to warrant title. Upon legal examination of such leasehold(s), should the title be found to be defective, [WVE] shall, at their [sic] expense, perform any curative action that is necessary and required by [Rubin's] legal examiner. Should the title be found to be not a "good and marketable" leasehold then [WVE] hereby agrees to replace the lease with substitute property agreeable to [Rubin].

Rubin retained attorney Mr. Morris to conduct the title examination and prepare a title opinion letter pertaining to the leasehold estate of the 120-acre tract. Mr. Morris did so and presented his title opinion letter to Rubin in July of 2000. However, Mr. Morris failed to identify a declaration of pooling, which was of record at that time in Ritchie County, and affected the 120-acre tract such that Rubin could not acquire the oil and gas

2

rights to the tract.[1] Inasmuch as Mr. Morris failed to identify this declaration of pooling, Rubin did not exercise its right of substitution. [2]

In 2000, Rubin drilled a well on the 120-acre tract and it has been producing gas from that well for sale to a third party continuously since then. Rubin spent approximately $200,000 to produce this well and its total income from the production and sale of gas therefrom has been in excess of $270,000.

In 2012, Antero Resources Appalachian Corporation ("Antero") offered to purchase Rubin's right to produce gas from the Marcellus Shale[3] underlying the 120-acre

---

[1]The declaration of pooling was recorded by CNG Development Co. ("CNG"), in 1986, and it affected the 120-acre tract and two adjacent tracts, one of which consisted of approximately 180 acres. At the time CNG recorded the declaration of pooling, it was the owner of the oil and gas leasehold estates in each of the three pooled tracts. In 1990, CNG drilled a well on the 180-acre tract, and that well has been producing natural gas continuously since that time. The parties agree that the legal effect of CNG's recording of the declaration of pooling, and then drilling a producing gas well on the 180-acre tract, was that CNG continued to hold by production the leasehold estate in all three of the pooled tracts, including the 120-acre tract, even after CNG's lease for the 120-acre tract would otherwise have expired under its own terms.

[2]Presumably WVE was also unaware of the declaration of pooling.

[3]*See Butler v. Charles Powers Estate ex rel. Warren*, 65 A.3d 885, 887 n.1 (Pa. 2013) ("In general, shale gas is a term used to define natural gas that has become trapped within various shale formations throughout North America. Marcellus shale natural gas is that gas which is located in the Marcellus Shale Formation, which covers 104,067 square miles in Ohio, West Virginia, Pennsylvania, Maryland, and New York."). The Marcellus Shale is located much deeper in the earth than is the stratum from which Rubin's well produces gas. "Recent technological advancements have made it possible to produce natural gas from the deep Marcellus and Utica Shale reservoirs. . . . As one of the largest

tract for the sum of $216,000, together with an overriding royalty of 2.375% (worth approximately $30,000). However, Antero conducted a title examination and discovered that the oil and gas leasehold estate in the 120-acre tract had been held by production by CNG since 1990. Antero gave notice to Rubin of this title defect, and advised that it would not go forward with its purchase of Rubin's Marcellus Shale rights. After learning about the declaration of pooling, Rubin informed Mr. Morris about the problem.

Thereafter, Rubin notified CNX, successor-in-title to CNG, that it had drilled a well on the 120-acre tract without knowing about the declaration of pooling. CNX asserted claims against Rubin, informally, based on Rubin's production of gas from the well. In March of 2013, Rubin entered into a settlement agreement with CNX for the sum of $32,455[4] to resolve those claims.[5] In July of 2013, Rubin and CNX entered into a "wellbore interest" assignment and bill of sale in the subject well. Rubin continues to operate the well, selling the gas to Dominion, a company related to CNX.

---

deposits of natural gas in the United States, the Marcellus Shale reservoir alone is estimated to contain enough gas to meet the entire energy demand in the United States for more than the next decade." Matt Warnock, *Marcellus and Utica Shale Natural Gas Development Presents New Revenue Opportunities, New Challenges for Local Governments in Ohio*, 23 No. 1 Ohio Mun. Serv. 2 (Jan./Feb. 2011).

[4] This sum includes $15,000 for a site location fee and $17,455 (the value of 1/32nd overriding royalty interest through December 31, 2012).

[5] Rubin asserts that it gave Mr. Morris notice of the defect in the title opinion letter approximately nine months before it ultimately resolved the matter with CNX.

In April of 2013, Rubin filed this legal malpractice action against Mr. Morris seeking to recover the amount it paid to CNX, and to recover the proceeds lost when its agreement with Antero was cancelled. The parties engaged in discovery through interrogatories and requests for production of documents. During a scheduling conference before the circuit court, the parties agreed the facts material to Rubin's claims against Mr. Morris were largely undisputed and this action should be resolved through summary judgment. Thereafter, the parties prepared a joint stipulation of facts, filed summary judgment motions, and presented oral argument to the circuit court.

By order entered January 6, 2015, the circuit court granted summary judgment against Rubin and in favor of Mr. Morris. The circuit court found that Rubin unnecessarily self-reported the drilling to CNX, and voluntarily entered into the CNX settlement agreement, even though the well had been drilled more than ten years prior. The circuit court reasoned that because Rubin *may have* acquired title by adverse possession, the voluntary settlement with CNX precluded any finding that the damages were proximately caused by Mr. Morris's negligence. The circuit court further found that Mr. Morris's negligence did not lead to the loss of the Antero deal because Mr. Morris "cannot be charged with the loss of a contract to sell rights that [Rubin] never would have owned." Finally, the circuit court rejected Rubin's claim it would have owned other valuable Marcellus Shale rights through the substitution clause had it been aware of the title defect as "too remote and speculative."

5

## II. STANDARD OF REVIEW

Rubin appeals the circuit court's order awarding summary judgment to Mr. Morris and denying its motion for summary judgment. Both parties agree that the facts material to Rubin's claims are largely undisputed and that this action should be resolved through summary judgment. We review the circuit court's decision de novo, according no deference to the legal conclusions reached. As we held in syllabus point one of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994): "A circuit court's entry of summary judgment is reviewed *de novo*."

## III. DISCUSSION

> "Generally, in a suit against an attorney for negligence, the plaintiff must prove three things in order to recover: (1) the attorney's employment; (2) his/her neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the plaintiff." Syl. Pt. 1, *Calvert v. Scharf,* 217 W.Va. 684, 619 S.E.2d 197 (2005).

Syl. Pt. 1, *Humphries v. Detch*, 227 W.Va. 627, 712 S.E.2d 795 (2011).

In this case, we are concerned only with the third element because Mr. Morris neither disputed that an attorney-client relationship existed nor that he was negligent in performing the title examination and title opinion. With regard to the third element, we held in syllabus point three of *Keister v. Talbott*, 182 W.Va. 745, 391 S.E.2d 895 (1990), that "[d]amages arising from the negligence of an attorney are not presumed, and a plaintiff in a malpractice action has the burden of proving both his loss and its causal connection to

6

the attorney's negligence." Consequently, "in order to prevail in a malpractice action against a lawyer, the plaintiff must establish not only his or her damages, but must additionally establish that, but for the negligence of the lawyer, he or she would not have suffered those damages." *Calvert v. Scharf*, 217 W.Va. 684, 695, 619 S.E.2d 197, 208 (2005). The purpose of this requirement is to safeguard against speculative and conjectural claims. *See, e.g., Harrison v. Casto,* 165 W.Va. 787, 271 S.E.2d 774 (1980) (finding no error in lower court's dismissal of case alleging malpractice against attorney who failed to file complaint on behalf of client upon finding that, although attorney did not file complaint, client had not been harmed as statute of limitations on action had not run at time malpractice action was instituted).

Before turning to the arguments of the parties, we note that this case involves malpractice in the performance of transactional work (giving advice or preparing documents for a business transaction) as opposed to litigation malpractice. *See Viner v. Sweet*, 70 P.3d 1046, 1052 (Cal. 2003) (explaining distinction and holding in both litigation and transactional malpractice action, "the crucial causation inquiry is *what would have happened* if the defendant attorney had not been negligent."); *Ware v. Durham*, 268 S.E.2d 668, 669 (Ga. 1980) ("Where the alleged malpractice is loss of a claim, the former client's recovery against the former attorney properly is limited by the amount that would have been recovered from the defendant or the potential defendant. . . . However, where the alleged malpractice . . . consists of allegedly negligent examination or certification of title to real estate, the rule . . . is that the former client may recover from the attorney his 'actual

damages.'") (citations omitted). "Some of the more common areas of 'transactional malpractice' include careless title searches, erroneous tax advice, and sloppy contract preparation. A survey of the cases indicates that the courts calculate damages by focusing on such matters as lost value, out of pocket expenses, and loss of future expectations." John H. Bauman, *Damages for Legal Malpractice: An Appraisal of the Crumbling Dike and the Threatening Flood*, 61 Temp. L. Rev. 1127, 1150 (1988) (footnotes omitted). The following example illustrates the proximate cause analysis utilized in a transactional legal malpractice claim.

> If the client's position is "my lawyer gave me bad advice that I followed, and it cost me money," the client in effect is saying, "My lawyer gave me incorrect advice. I acted in reliance on this advice, and as a proximate result, I sustained $ x in damages. But for that advice, I would not have been damaged at all." At times, the attorney's negligence does not relate to decisions made in the course of litigation but involves some recommendation or guidance negligently given. Therefore, the "case within a case" will not entail the reconstruction of a trial or appeal; instead, *the client must show alternative measures he could have taken "but for" the attorney's faulty advice.*

Richard H.W. Maloy, *Proximate Cause: The Final Defense in Legal Malpractice Cases*, 36 U. Mem. L. Rev. 655, 676 (2006) (emphasis added). The crux of Rubin's argument is that the alternative measure here is obvious; had Mr. Morris alerted it to the declaration of pooling, Rubin would have availed itself of the substitution clause in its contract with WVE and avoided the losses at issue.

While the extent of damages in a legal malpractice action is ordinarily a question of fact, the parties here stipulated to the monetary amount Rubin (1) paid CNX to settle their dispute over the oil and gas leasehold, and (2) suffered when the Antero deal did not materialize. The pivotal issue is therefore whether Rubin established that its damages were proximately caused by Mr. Morris's negligence. A proximate cause determination is reviewed on appeal as a question of law if all evidentiary inferences are incapable of reasonable doubt. *Donald v. Long Branch Coal Co.*, 86 W.Va. 249, 103 S.E. 55 (1920); *Bullard v. Bailey*, 959 P.2d 1122 (Wash. 1998). With this background to guide us, we proceed to consider the merits of this case. [6]

## A. CNX Damages

Rubin seeks damages in the amount of $32,455, which it paid to settle its dispute with CNX and to obtain CNX's consent for Rubin to continue to operate the well on the 120-acre tract. Rubin argues there is a clear nexus between Mr. Morris's negligence and its damages; the damages that resulted in reliance on this error were both direct and

---

[6] Notwithstanding our ultimate focus upon the proximate causation of damages, we note the second element of a legal malpractice claim requires a showing that Mr. Morris acted negligently and breached his duty to Rubin through the failure to discover the declaration of pooling. "An attorney who undertakes to perform professional services for a client is required to exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession in similar circumstances." Syl. Pt. 1, *Keister*, 182 W.Va. at 746, 391 S.E.2d at 896. Rubin retained Mr. Morris for the express purpose of determining whether Rubin could acquire good and marketable title and the exclusive right to drill upon the leasehold. Clearly, Mr. Morris failed to conduct a proper title search that would have disclosed the declaration of pooling and deviated from the accepted standard of care.

foreseeable when it promptly put the property to its intended use of producing oil and gas, thereby violating the declaration of pooling of record that Mr. Morris omitted from his title opinion. Accordingly, Rubin asserts it met the proximate cause requirement, typical of any negligence tort. *See e.g., Spencer v. McClure*, 217 W.Va. 442, 446, 618 S.E.2d 451, 455 (2005) (recognizing plaintiff has burden in tort action to prove by preponderance of evidence defendant was negligent and such negligence was proximate cause of injury).

Rubin further argues the circuit court clearly misconstrued this Court's holding in *Calvert* when it determined Rubin's settlement with CNX precluded any finding that these damages were proximately caused by Mr. Morris's negligence. We agree that *Calvert* does not stand for the proposition that plaintiffs cannot maintain a legal malpractice action after settling a lawsuit. *See, e.g., Parnell v. Ivy*, 158 S.W.3d 924 (Tenn. Ct. App. 2004) (holding settlement of underlying lawsuit does not shield former attorneys from legal malpractice liability). Rather, this Court in *Calvert* simply declined the invitation to deviate from the proximate cause standard.[7]

---

[7] In *Calvert*, the plaintiff filed suit alleging malpractice when the lawyer was negligent in drafting a provision in a will. We rejected the contention that the Calverts were entitled to damages merely because they were called into court by virtue of the declaratory action regarding the will. 217 W.Va. at 696, 619 S.E.2d at 209. Instead, we found the Calverts were required to establish they suffered an actual loss and that the loss "was proximately caused by negligence in the drafting" of the will. *Id.* at 695-96, 619 S.E.2d at 208-09. Because the defect was ultimately cured so that the intended beneficiary received his bequest pursuant to the will, we found "no causal connection between the attorney's

Conversely, Mr. Morris argues that because Rubin extracted natural gas from the property for a dozen years, it had obtained fee simple title to the oil and gas rights underlying the 120-acre tract through adverse possession long before it settled the claims of CNX. Mr. Morris states Rubin could have avoided *any* liability had it raised with CNX the defense of adverse possession; because Rubin had the ability to avoid the CNX losses, Mr. Morris contends its failure to mitigate becomes the proximate cause of its injury. Rubin disagrees with Mr. Morris's legal assessment and maintains it had no reasonable prospect of prevailing on the theory of adverse possession.[8] Rubin claims it properly mitigated damages upon discovery of its trespass by immediately cutting off its liability and reaching a favorable settlement.

While the circuit court categorized its decision to deny Rubin's request for the CNX damages as Rubin's failure to establish the element of proximate cause, this issue is actually governed by the related principle of mitigation of damages. The theoretical

---

negligence and the beneficiary's damages, because the beneficiary has not suffered damages proximately caused by the attorney's negligence." *Id*.

[8] Rubin asserts it could not establish the existence of each of the six elements of adverse possession by clear and convincing evidence. *See* Syl. Pt. 2, *Brown v. Gobble*, 196 W.Va. 559, 474 S.E.2d 489 (1996) ("The burden is upon the party who claims title by adverse possession to prove by clear and convincing evidence all elements essential to such title."); Syl. Pt. 3, *Somon v. Murphy Fabrication and Erection Co.,* 160 W.Va. 84, 232 S.E.2d 524 (1977) ("One who seeks to assert title to a tract of land under the doctrine of adverse possession must prove each of the following elements for the requisite statutory period: (1) That he has held the tract adversely or hostilely; (2) That the possession has been actual; (3) That it has been open and notorious (sometimes stated in the cases as visible and notorious); (4) That possession has been exclusive; (5) That possession has been continuous; (6) That possession has been under claim of title or color of title.").

foundation for a plaintiff's duty to mitigate damages is that the defendant's negligence is not the proximate cause of any damages that could have been avoided had the plaintiff taken reasonable steps to mitigate. *Preston v. Keith*, 584 A.2d 439, 441-42 (Conn. 1991).

As discussed above, proximate cause of damages is an element of a negligence action and thus the plaintiff has the burden of establishing this element. Based on the undisputed facts of this case, we find that Rubin has established that the damages it incurred by settling the claims of CNX were proximately caused by Mr. Morris's negligence because those damages naturally flowed from his failure to detect the declaration of pooling. We now turn to Mr. Morris's argument regarding mitigation of damages.

> A plaintiff's duty to mitigate damages focuses on whether the plaintiff took reasonable steps to avoid or reduce damages that were proximately caused by the negligence of the defendant. A damaged party is only expected to do what is reasonable under the circumstances and need not embark upon a course of action that may cause further detriment to him or her. The doctrine of mitigation of damages does not permit damages reduction based on what could have been avoided through Herculean efforts, and a plaintiff's duty to mitigate damages does not extend to accepting a position that entails great hardship or personal embarrassment. An injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through ordinary and reasonable care, without requiring undue effort or expense. Furthermore, when both of the parties have the same opportunity to reduce damages, the defendant cannot later contend that the plaintiff failed to mitigate. *The general rule is that injured parties need not institute and prosecute lawsuits in order to mitigate damages as litigation is too uncertain and costly to impose such a duty on a party*.

12

25 C.J.S. *Damages* § 184 (emphasis added and footnotes omitted); *see also Robinson v. Carney*, 632 A.2d 106, 108 (D.C. Ct. App. 1993) (noting general rule is injured party need not institute and prosecute lawsuits in order to mitigate damages).

The failure to mitigate damages is a defense which precludes recovery for those consequences of the negligent attorney's actions which could have been avoided through a plaintiff's reasonable efforts to minimize loss. *See Smith v. Childs*, 437 S.E.2d 500, 507 (N.C. Ct. App. 1993). As with other defenses, the burden is on the attorney defendant to show the plaintiff neglected to mitigate damages. *Id.*; *MB Indus., LLC v. CNA Ins. Co.*, 74 So.3d 1173, 1181 (La. 2011) (holding in legal malpractice action, failure to mitigate damages is an affirmative defense, and burden of proof is on party asserting defense). When raising this defense, the defendant attorney bears the burden of proving that the proposed means of mitigation were reasonable under the circumstances, could be accomplished at a reasonable cost, and were within the plaintiff's ability. *See McCormick Int'l USA, Inc. v. Shore*, 277 P.3d 367, 371 (Idaho 2012).

We hereby hold that a plaintiff in a legal malpractice action has a general duty to mitigate his or her damages. This doctrine requires a plaintiff to take reasonable steps within his or her ability to minimize losses caused by the attorney's negligence. However, a plaintiff is not required to take actions which are impractical, disproportionately expensive, or likely futile. The scope of a plaintiff's duty to mitigate damages depends on the particular facts of the case. *See MB Indus.*, 74 So.3d at 1181 (La.

13

2011); *Am. Reliable Ins. Co. v. Navratil,* 445 F.3d 402, 406 (5th Cir. 2006) ("Although as a general principle, a client has a duty to mitigate damages caused by its attorney's malpractice, such a duty cannot require the client to undertake measures that are unreasonable, impractical, or disproportionately expensive considering all of the circumstances.").

Applying this standard to the instant case, it is clear that Rubin took reasonable steps under the circumstances to mitigate its damages. After discovering the title defect, Rubin took responsible actions to minimize the liabilities arising from the problem, which is the essence of mitigation of damages. Rubin weighed the consequences to be avoided and assessed its overall exposure to liability at approximately $147,000 arising from Mr. Morris's failure to alert it to the title defect.[9] By contrast, Rubin negotiated a settlement with CNX that was much less expensive. Based on these facts, we find that Rubin's decision to settle the matter with CNX instead of pursuing litigation on what it believed to be an unmeritorious affirmative defense of adverse possession *was* mitigation of damages. "Many settlements are a reasonable response to a difficult situation created by another's negligence." *Flint v. Hart*, 917 P.2d 590, 596 (Wash. Ct. App. 1996).

---

[9] Rubin contends it was facing approximately $30,000 in plugging expenses to abandon the well, $17,000 in royalty payments that the owner would have demanded, and approximately $100,000 of lost profits owed to the working interest owners of the well. Rubin also claims it would have lost its own investment in producing and operating the well.

The flaw in Mr. Morris's argument is that it is built on the faulty premise that Rubin's adverse possession claim would come without cost. However, Rubin's proactive settlement not only eliminated the risk of a much larger judgment against it, the settlement also removed from the equation the certainty of litigation costs and delays of production. "[T]he mitigation rule does not require plaintiff to grasp vainly for twigs while drowning in flood-waters of defendant's creation." *Smith*, 437 S.E.2d at 508; *see also Covino v. Peck*, 559 A.2d 868, 872 (N.J. Super. Ct. App. Div. 1989) (finding "as a matter of law," plaintiff was not required to institute action in an effort to mitigate damages; "wrongdoer should not be permitted to avoid real damages by raising an issue made necessary by his very wrong.").

Accordingly, we find that Rubin is entitled to recover the damages it incurred by settling the claims of CNX. *See McCormick Int'l USA*, 277 P.3d at 371 ("Where an injured party takes steps to mitigate the damages caused by another, she is entitled to the costs she reasonably incurs in avoiding those damages."); Comment Note – *Duty to Mitigate Damages*, 81 A.L.R. 282 (Originally published in 1932) ("A party has an obligation to take such steps as will reasonably tend to minimize damages occasioned by breach of contract or by tort, and such party is entitled to recover costs reasonably incurred in minimizing such damages[.]").

B. Antero Damages

Rubin also seeks damages of $246,000 in lost profits it suffered when the Antero deal was cancelled.[10] Rubin argues the link between Rubin's loss of the Antero purchase agreement and Mr. Morris's negligence is direct and certain; the fundamental purpose for which he was hired was defeated when Mr. Morris failed to discover the declaration of pooling. Rubin maintains that but for Mr. Morris's negligence, it would have exercised its contractual right to demand that WVE cure the defect or substitute replacement property. To arrive at the opposite conclusion, Rubin asserts the circuit court misapplied this Court's analysis in *Keister*, a case involving very different facts. Finally, Rubin argues the circuit court erred in finding the Antero damages were speculative; it was not claiming unproven lost profits based on a contention that it would have been able to sell the leasehold to a hypothetical purchaser. Instead, Rubin's loss of profits claim was based on evidence of an actual offer from Antero.

Mr. Morris counters that pursuant to *Keister*, Rubin is not entitled to recover its claimed Antero damages because it is not Mr. Morris's fault that Rubin did not acquire the Marcellus Shale rights to the 120-acre tract. Mr. Morris also maintains that Rubin cannot prove its entitlement to the Antero lost profit damages with reasonable certainty because it would be wholly speculative to now conclude that Rubin would have exercised

---

[10] This sum includes $216,000 Antero offered to pay Rubin for its right to produce gas from the Marcellus shale underlying the property, plus $30,000.00 as the present value of those overriding royalties.

its contractual right of substitution with WVE and acquired property that would have secured such an offer from Antero. [11]

In *Keister*, the plaintiffs were purchasers of real property which purportedly included both the surface and the mineral rights. The plaintiffs filed a negligence action against the attorney, Mr. Talbott, who overlooked a prior out-conveyance of mineral rights during his title search and argued they were entitled to recover the value of the coal under the property or of the profits they could have made from extracting it. 182 W.Va. at 748, 391 S.E.2d at 898. This Court disagreed and held that the plaintiffs failed to make a prima facie showing that the damage they asserted below – loss of the right to the coal underlying their property – was the direct and proximate result of the negligence of the attorney. *Id*. at 751, 391 S.E.2d at 901. We explained that

> at the time Mr. Talbott undertook the title search, the grantor, Mrs. Brown, had no title to the coal under her property. Had Mr. Talbott correctly examined the title, his discovery of the prior outconveyance would not have altered that fact. Thus, the plaintiffs were not deprived of the coal rights as a proximate result of Mr. Talbott's negligence. Consequently, the plaintiffs' damages for the loss of their bargain, i.e., the failure to acquire ownership of the coal, cannot be charged against Mr.

---

[11] Mr. Morris also states that Rubin is entitled to no damages because the income generated from the well exceeded the price Rubin paid for the leasehold. *See Keister*, 182 W.Va. at 749-50, 391 S.E.2d at 899-900 ("damages are ordinarily determined by subtracting the value of the property actually received from the purchase price paid."). We reject this argument because it overly simplifies the issues at hand and ignores the fact that Rubin faced considerable financial liability for its unauthorized drilling of this well.

Talbott. *What they did lose as a result of his negligence was the opportunity to rescind the purchase contract.*

*Id.*, at 750, 391 S.E.2d at 900 (emphasis added, footnote omitted).

*Keister* is factually distinguishable from the instant case. Here, Rubin lost more than the opportunity to rescind its purchase agreement with WVE. Relying on Mr. Morris's faulty title opinion, Rubin lost its valuable contractual right to demand that WVE either cure the title defect to the 120-acre tract (i.e., acquire the leasehold estate) or substitute it with suitable replacement property. Consequently, Rubin has demonstrated that but for Mr. Morris's negligence, it would have realized the proceeds of Antero's offer to produce gas from the Marcellus Shale either from the 120-acre tract (had the title defect been cured) or the replacement leasehold.

This Court has long held that loss of profits may be recoverable in tort actions. *Hardman Trucking, Inc. v. Poling Trucking Co., Inc.,* 176 W.Va. 575, 579, 346 S.E.2d 551, 555 (1986). Nonetheless, "the loss of profits must be established with reasonable certainty and not be speculative or conjectural in character or amount. *Franklin v. Pence,* 128 W.Va. 353, 36 S.E.2d 505 (1945)." *Melbourne Bros. Constr. Co. v. Pioneer Co.*, 181 W.Va. 816, 821, 384 S.E.2d 857, 862 (1989); *see also Bridgeport Harbour Place I, LLC v. Ganim,* 30 A.3d 703, 722 (Conn. App. Ct. 2011) (recognizing damages for lost profits in tort action may be difficult to prove with "exactitude" and finding such damages are recoverable only to extent evidence affords sufficient basis for estimating their amount

18

with reasonable certainty). Application of these principles in a legal malpractice action does not make an attorney an insurer of pie-in-the-sky expectations of the client. Rather, this tenet simply operates to restore the client to the economic position that he or she would be in *but for* the attorney's negligence. *See e.g.*, *Roberts v. Holland & Hart*, 857 P.2d 492, 497 (Colo. App. 1993) (holding claim for lost profits may be recoverable in legal malpractice action when traceable to and direct result of attorney's negligence); *Sterling Radio Stations, Inc. v. Weinstine*, 765 N.E.2d 56, 62 (Ill. App. Ct. 2002) ("The legal malpractice action places the plaintiff in the same position he or she would have occupied but for the attorney's negligence."). Applying these principles to the instant action, we find that Rubin is entitled to recover the Antero damages because it established these lost profits with reasonable certainty. [12]

## IV. CONCLUSION

For the above-stated reasons, we find there is no genuine issue of material fact and judgment for Rubin should be entered as a matter of law. Accordingly, we reverse the circuit court's order of January 6, 2015, which entered summary judgment in favor of

---

[12] To the extent Mr. Morris argues that we should not suppose what actions Rubin *would have taken* because that inquiry is inherently speculative, we remind him that it is his carelessness that necessitates the very exercise of examining "what would have happened in a world that did not include the defendant's negligence." Lawrence W. Kessler, *Alternative Liability in Litigation Malpractice Actions: Eradicating the Last Resort of Scoundrels*, 37 San Diego L. Rev. 401, 408 (2000).

Mr. Morris and remand this case with instructions to enter summary judgment in favor of Rubin in the amount of $278,455.

Reversed and remanded.