IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2017 Term

_____

No. 15-0606

_____

FILED
November 9, 2017
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

JOHN F. KAY, JR., Individually and as Trustee of THE MILDRED F. KAY
TRUST, KAY T. ROBERTS and JEAN T. HOLT, Co-Executors of the Estate
of FLORENCE K. TEMPLE, W. RICHARD KAY, JR., HENRY W. BATTLE,
JULIA T. HUTCHINSON, JENNIE GRAHAM, Executrix of THE ESTATE
OF JAMES KIRK GRAHAM, MARGARET K. HUFFMAN, Executrix of
THE ESTATE OF HENRY WILLIAM HUFFMAN, JAMES L. KAY,
JOHN D. KAY, BARBARA G. RANDOLPH, WILLIAM M. MURPHY,
Co-Trustee of THE JESSIE K. THAYER TRUST, MARGARET K.
HUFFMAN, Co-Trustee of  THE JESSIE K. THAYER TRUST, and
THE KAY COMPANY, LLC,
Petitioners

v.

MCGUIREWOODS, LLP,
Respondent

_____

Appeal from the Circuit Court of Kanawha County
Honorable James C. Stucky
Civil Action No. 11-C-615

AFFIRMED, IN PART; REVERSED IN PART; AND REMANDED
_____

Submitted:  October 17, 2017
Filed:  November 9, 2017

Kelly Elswick-Hall, Esq.
Marvin W. Masters, Esq.
The Masters Law Firm, lc
Charleston, West Virginia

Mark A. Ferguson, Esq.
Ferguson Law Offices
Charleston, West Virginia
Counsel for Petitioners

David B. Thomas, Esq.
Susan M. Robinson, Esq.
Bryant J. Spann, Esq.
Sarah A. Leonard, Esq.
Thomas Combs & Spann, PLLC
Charleston, West Virginia
Counsel for Respondent

CHIEF JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS

1. The issue of whether causation and damages can be demonstrated in a legal malpractice case following a settlement is one that necessarily must be determined on a case by case basis.

2. "A plaintiff in a legal malpractice action has a general duty to mitigate his or her damages. This doctrine requires a plaintiff to take reasonable steps within his or her ability to minimize losses caused by the attorney's negligence. However, a plaintiff is not required to take actions which are impractical, disproportionately expensive, or likely futile. The scope of a plaintiff's duty to mitigate damages depends on the particular facts of the case." Syl. Pt. 4, *Rubin Resources, Inc. v. Morris*, 237 W.Va. 370, 787 S.E.2d 641 (2016).

3. "Generally, in a suit against an attorney for negligence, the plaintiff must prove three things in order to recover: (1) the attorney's employment; (2) his/her neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the plaintiff." Syl. Pt. 1, *Calvert v. Scharf*, 217 W.Va. 684, 619 S.E.2d 197 (2005).

4. Although damages in a legal malpractice claim are measured with reference to the underlying claim of negligence, the malpractice claim is a separate and distinct claim. As a result, a settlement agreement does not automatically extinguish a legal malpractice claim.

LOUGHRY, Chief Justice:

The petitioners, former shareholders of Kay Company ("Kay Co.") and Kay Co, LLC ("Kay LLC"),[1] appeal from two orders[2] entered by the Circuit Court of Kanawha County through which summary judgment was granted to the respondent McGuireWoods, LLP ("McGuireWoods" or "MW") in connection with claims the petitioners filed against McGuireWoods, their former legal counsel.[3] As grounds for their appeal, the petitioners argue that the circuit court erred in ruling that a settlement reached by all but one of the petitioners[4] with the Internal Revenue Service ("IRS") prevents them from establishing causation and damages on any of their claims. The petitioners further challenge the circuit court's finding that there are no factual issues in need of resolution and its ruling that Mrs. Graham's status as a non-settler with the IRS prevents her from asserting claims against MW. As part of this appeal, McGuireWoods alleges that the petitioners' claims are barred by the five-year statute of limitations which governs Virginia contract claims.[5] Upon our careful review of this matter, we conclude that the circuit court erred in reasoning that the

---

[1]Kay Co., LLC is the successor corporation of Kay Co.

[2]The first order was entered on May 27, 2015, and the second on December 5, 2016.

[3]Those claims were grounded in legal malpractice; negligent misrepresentation; fraud; detrimental reliance; and joint venture.

[4]Mrs. Graham did not enter into a settlement with the IRS; the IRS agreed to forego collection of the tax assessment from her husband's estate. *See infra* note 18.

[5]This claim was raised below but never ruled upon by the circuit court.

1

settlement with the IRS prohibits the petitioners from going forward on all of their claims. We further determine that the circuit court erred in ruling that the lack of a settlement with the IRS precluded Mrs. Graham from asserting any claims against MW. We affirm the lower court's rulings with regard to detrimental reliance and joint venture.[6] With regard to the cross-appeal raised by McGuireWoods, we find no merit to the claim and, accordingly, it is denied.

## I. Factual and Procedural Background

At the center of this case is the sale of the Kay Co.,[7] a transaction for which the petitioner shareholders engaged MW to represent their interests. The petitioners initially conferred with McGuireWoods to obtain tax advice with regard to the prospective sale of the Kay Co. stock. One of the specific issues addressed was a concern that gains from the sale and distribution of the Kay Co. stock would be taxed twice–once to the corporation and then again to the individual stockholders. Due to the low basis of such stock,[8] a huge tax consequence was anticipated as a result of the sale.

---

[6]The circuit court ruled in its December 5, 2016, order that the plaintiffs had abandoned any independent claim of detrimental reliance based on a concession that such reliance related to their claim of fraud. With regard to the plaintiffs' claim of joint venture, the trial court ruled in this same order that the plaintiffs had failed to produce any evidence of the requisite profit-sharing agreement necessary to demonstrate such a theory.

[7]Kay Co., a closely held family corporation, was formed in 1929 in West Virginia. The company, whose primary business concerns were coal, oil, and gas, had acquired a stock portfolio worth nearly $10 million dollars.

[8]The low basis existed due to the lengthy period of ownership.

While conferring with McGuireWoods on an unrelated matter, Skip Roberts, one of the Kay Co. Board members,[9] mentioned the double taxation issue. He was referred to a particular MW attorney based on his successful avoidance of double taxation in a similar transaction. McGuireWoods advised Mr. Roberts that it could arrange a sale of Kay Co. with favorable tax consequences for a contingent fee of $125,000.[10] The MW attorney later contacted Mr. Roberts to disclose a buyer with sufficient capital losses to offset gains from the sale of Kay Co.'s portfolio. As a result of this proposed transaction, the MW lawyer advised the Kay Co. shareholders that they would be taxed only once on the capital gains from the sale.[11]

In a letter dated July 5, 2000, MW described the structure of the proposed transaction as well as the federal income tax consequences to both the shareholders and the company. On the same date, McGuireWoods forwarded an engagement letter to the Kay Co. Board of Directors.[12] In the engagement letter, MW set forth the nature of its services as

---

[9]Mr. Roberts was not a Kay Co. shareholder.

[10]MW indicated that it had experience in arranging a transaction where, for a reduced purchase price, an entity with purported business losses would purchase a corporation with "built in" capital gains. In this case, the purchase price was set at 90% of the Kay Co.'s portfolio of marketable securities–a reduction of approximately $1 million.

[11]The individual stockholders would be subject to long-term capital gains taxes but the corporation would effectively escape taxation based on the offsetting of the buyer's losses against the Kay Co.'s gains.

[12]The engagement letter, dated July 5, 2000, was signed by the President of Kay Co. in Charleston, West Virginia.

"advising you in connection with the structuring, negotiating and closing of the Sale." McGuireWoods further agreed to provide legal advice "with respect to the federal income tax consequences of the Sale to the Company and its shareholders." To address issues of West Virginia law, MW recommended that Kay Co. consult with local counsel concerning "the Company's legal standing in West Virginia and its outstanding stock."[13]

After numerous phone conferences, emails and letters were exchanged,[14] the sale of Kay Co. transpired on October 26, 2000. Pursuant to the arrangement outlined by McGuireWoods in its July 5, 2000, correspondence, the stock of Kay Co. was purchased by CMD Statutory Trust ("CMD Trust"). The funds required by CMD Trust to effect the purchase of Kay Co. were leveraged, purportedly with the use of offshore funds. CMD Trust immediately sold the company.[15]

---

[13]As recommended by MW, Kay Co. retained both a West Virginia law firm and a local accounting firm to give it additional advice.

[14]MW claims that at least twenty conference calls transpired between it and the Kay Co. in connection with the proposed sale.

[15]The name of Kay Co. was changed by CMD Trust to CMD Co.

4

On August 3, 2007, the IRS assessed twelve former shareholders[16] of the Kay Co. $2.7 million in taxes and $556,000 in penalties.[17]  In late 2009, all but one of the twelve assessed shareholders elected to execute Closing Agreements and settle the tax dispute with the IRS.  Collectively, these former Kay Co. shareholders paid almost $1.8 million.  Mrs. Graham successfully obtained a Tax Court decision that her husband's estate had no liability as a transferee of the assets of the CMD Co. for the tax year ending October 26, 2000.[18]  When the IRS later sought to collect this same federal tax deficiency from Kay LLC, the claim was settled for $5,000.[19]

On April 14, 2011, the petitioners filed the underlying action against MW in the Circuit Court of Kanawha County.[20]  Immediately after the first deposition was taken, MW filed a motion for summary judgment, which was denied by order issued on February

---

[16]The IRS elected to assess only the Kay Co. Board of Directors who were named on the MW engagement letter.

[17]The IRS went after the former shareholders for the tax deficiency when CMD Co. did not have sufficient assets to pay the taxes levied against it.

[18]The petitioners maintain that the IRS ruling was based upon Nevada collection laws. *See Starnes v. C.I.R.,* 680 F.3d 417, 427-29 (4th Cir. 2012) (discussing 26 U.S.C. § 6901(a) and explaining that "[a]n alleged transferee's substantive liability for another taxpayer's unpaid taxes is purely a question of state law . . . ; plac[ing] the IRS in precisely the same position as that of ordinary creditors under state law").

[19]The IRS did not assess Kay LLC until early 2010.

[20]The case was removed to federal district court and then remanded.

3, 2013. After substantial discovery had ensued,[21] McGuireWoods filed a renewed motion for summary judgment. As grounds for its motion, MW argued that the petitioners' settlement with the IRS stood as a bar to any final adjudication concerning the legality of the IRS assessment and the related issue of whether its tax advice to the petitioners constituted legal malpractice. Through its ruling issued on May 27, 2015, the circuit court granted MW's renewed motion for summary judgment. Concluding that the IRS settlement prevented the petitioners "from establishing the requisite causal connection between the alleged wrongful acts or omissions of McGuireWoods . . . and any damages," the circuit court dismissed the complaint with prejudice.[22] The circuit court similarly dismissed the claim of Mrs. Graham based on its finding that she "has not suffered damages because of any alleged malpractice by" MW.[23]

Following the petitioners' appeal to this Court, we remanded the matter to the circuit court "for the limited purpose of making findings and conclusions with regard to petitioners' claims for misrepresentation, fraud, detrimental reliance, and joint venture."[24] Complying with this directive, the circuit court ruled in its order of December 5, 2016, that

[21]Twenty-six individuals were deposed by this time.

[22]Despite its grant of summary judgment to MW on all of the petitioners' claims against it, the circuit court only addressed the claim of legal malpractice in its order.

[23]The circuit court failed to acknowledge as potential damages the $24,000 in legal fees Mrs. Graham incurred in challenging the tax assessment issued against her husband.

[24]*See supra* note 22.

6

the plaintiffs had abandoned their detrimental reliance claim.[25] Grouping the negligent

misrepresentation and fraud counts together, the circuit court concluded that the plaintiffs'

settlement of the IRS claims precluded them from establishing liability and causation with

regard to those claims. Citing its previous ruling of May 27, 2015, the circuit court found

this Court's decision in *Calvert v. Scharf*[26] controlling, opining that the plaintiffs could not

prove they received inaccurate or negligent tax advice from MW given the absence of a

finding by a competent tribunal that the plaintiffs were actually liable for CMD Co.'s[27]

unpaid tax liability.[28] Linking the misrepresentation and fraud counts to the same allegations

underlying the petitioners' malpractice claim, the circuit court concluded that those counts

similarly "fail[ed] as a matter of law."[29] Addressing the plaintiffs' joint venture claim, the

circuit court decided that this theory of imposing vicarious liability failed as a matter of law

for the same reasons the negligent misrepresentation and fraud claims failed. Citing the

absence of any profit-sharing arrangement between McGuireWoods and CMD Trust or

---

[25]This conclusion was based on the circuit court's finding that the plaintiffs had conceded in their Memorandum in Opposition to Defendant's Motion for Summary Judgment that the alleged reliance pertained to their fraud claim.

[26]217 W.Va. 684, 619 S.E.2d 197 (2005).

[27]*See supra* note 17.

[28]The circuit court further ruled that the plaintiffs could not establish that any damages resulted from the rendering of MW's tax advice.

[29]The circuit court decided that the negligent misrepresentation claim failed for the same reasons that the malpractice claim failed–inability to establish causation and damages. And, because "the record does not support a professional malpractice claim, it cannot meet the more stringent standard required to prove the intentional tort of fraud."

coequal control over a common commercial pursuit,[30] the circuit court further concluded that the plaintiffs had failed to produce evidence of a joint venture.

The petitioners seek relief from the circuit court's grant of summary judgment and the related dismissal of their action with prejudice. McGuireWoods asks this Court to affirm the lower court's ruling and to grant its cross-appeal seeking application of the five-year statute of limitations for contractual actions that arise under Virginia law.

## II. Standard of Review

The plenary nature of our review of a summary judgment ruling is well-established. *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). And the standard we apply to the lower court's decision to grant summary judgment is similarly axiomatic: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Surety Co. v. Fed'l Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). Bearing these standards in mind, we proceed to consider whether the trial court erred in its grant of summary judgment.

---

[30]*See Armor v. Lantz*, 207 W.Va. 672, 535 S.E.2d 737 (2000); *accord* Pyles v. Mason Cty. *Fair, Inc.*, No. 17-0300, __ W.Va. __, __ S.E.2d __ (November 1, 2017).

## III. Discussion

At the center of the challenged rulings is the postulate that the absence of a tax court ruling validating the IRS assessment[31] automatically precludes any claim by the petitioners against McGuireWoods arising from its legal advice. Because the shareholders[32] elected to settle after incurring substantial legal fees in challenging the tax assessments, the circuit court ruled that certain issues bearing on the petitioners' claims against MW can never be adjudicated. While both the circuit court and MW view this Court's decision in *Calvert* as compelling this conclusion, a judicious reading of that opinion demonstrates otherwise. *See* 217 W.Va. 684, 619 S.E.2d 197.

The issue presented in *Calvert* was whether the intended beneficiaries of a will had standing to bring a malpractice claim where a settlement precluded a determination of

---

[31]MW maintains that if the petitioners had fully litigated the CMD Co. tax deficiency assessed against them as transferees, they would have been successful. While both the circuit court and McGuireWoods cite a Fourth Circuit case as authority "for the taxpayer on similar facts," that case did not resolve the issue of whether the former shareholders qualified as transferees under federal tax law. Instead, it was decided under North Carolina law that the Tax Commissioner failed to prove that a reasonably diligent person in the former shareholders' position would have had actual or constructive knowledge of the buyer's non-payment of the subject taxes. *See Starnes*, 680 F.3d at 430, 437; *see also Weintraut v. C.I.R.*, 2016 WL 4040793 at n.61 (U.S. Tax Ct. 2016) (discussing *Starnes* and stating "it was irrelevant whether the taxpayers were transferees for purposes of sec. 6901" due to court's ruling that "the taxpayers were not liable under applicable State law").

[32]When denoting the shareholders in corporate fashion, we are referencing the eleven shareholders who settled their claims with the IRS.

9

whether the will had properly effectuated the testator's intent. The issue of standing was affirmatively resolved with our holding in *Calvert* that

> [d]irect, intended, and specifically identifiable beneficiaries of a will have standing to sue the lawyer who prepared the will where it can be shown that the testator's intent, as expressed in the will, has been frustrated by the negligence of the lawyer so that the beneficiaries' interest(s) under the will is either lost or diminished.

217 W.Va. at 685, 619 S.E.2d at 198, syl. pt. 2. Despite this favorable ruling on standing, we further determined that the *Calvert* beneficiaries could not pursue a malpractice claim "under the particular facts of this case" given their inability to demonstrate "they had suffered damages that were proximately caused by attorney malpractice." *Id.* at 686, 619 S.E.2d at 199.

As we explained in *Calvert,* "in order to prevail in a malpractice action against a lawyer, the plaintiff must establish not only his or her damages, but must additionally establish that, but for the negligence of the lawyer, he or she would not have suffered those damages." 217 W.Va. at 695, 619 S.E.2d at 208. The decision of the intended beneficiaries to settle the underlying declaratory judgment action was determined to bar the resolution of the issue of whether any negligence in the drafting of the subject will proximately caused injury to the Calverts. *Id.* at 696, 619 S.E.2d at 209. Due to the unitary issue asserted in the declaratory judgment action of whether the will validly exercised the power of appointment, this Court recognized that the settlement of the declaratory judgment action prevented that

10

issue from being decided. And, absent that determination, the intended beneficiaries could not demonstrate they had suffered loss as a result of the will's drafting.

Seeking to obtain the same result as in *Calvert,* MW argues that the settlement agreement itself was what barred the intended beneficiaries from proceeding against the will's preparer. But when this Court concluded in *Calvert* that damages could not be linked to the will's drafting in that case, we were not ruling that a settlement agreement proscribes proof of causation in all instances. The critical issue of whether causation and damages can be demonstrated in a legal malpractice case following a settlement is one that necessarily must be determined on a case by case basis.[33] This is clear from a review of our cases in this area. *See, e.g., Rubin Resources, Inc. v. Morris*, 237 W.Va. 370, 787 S.E.2d 641 (2016) (reversing circuit court's ruling that malpractice plaintiff's settlement with third party precluded finding that alleged damages were proximately caused by attorney's negligence); *Burnworth v. George*, 231 W.Va. 711, 749 S.E.2d 604 (2013) (upholding summary judgment for lawyer because plaintiff was unable to prove he sustained damages from failure to conduct title search where plaintiff disregarded attorney's advice to delay closing for deed of trust inspection and then, through stipulated settlement, forgave collateral including allegedly defective deed of trust); *Sells v. Thomas*, 220 W.Va. 136, 640 S.E.2d

---

[33]In its response to the petitioners' supplemental brief, MW recognizes that the unique facts of a given case govern the issue of whether an attorney's negligence may be established following settlement.

11

199 (2006) (reversing grant of summary judgment to attorney in malpractice case due to genuine issues of fact regarding whether attorney's failure to pursue underinsured motorist claim prior to settlement caused damage to client). In trying to equate the effect of the settlement in *Calvert* to the effect of the IRS settlement in this case, MW reaches too far. Unlike *Calvert*, where the testamentary dispute was no longer justiciable due to settlement, the issue presented here of whether the advice given to the petitioners by MW constituted malpractice, misrepresentation, or fraud can still be litigated. In clear contrast to *Calvert*, the IRS settlement did not extinguish the claims at issue here.

Furthermore, in *Morris* this Court squarely rejected the position advanced by MW. Like this case, the malpractice at issue was transactional as opposed to litigation-based malpractice.[34] Based on a negligent title examination that failed to identify a declaration of pooling, the malpractice plaintiff, Rubin Resources, sought to recover damages for its lost opportunity to substitute a different piece of property in the event of a title defect and lost proceeds from a gas production agreement that fell through upon discovery of the title defect. 237 W.Va. at 372-73, 787 S.E.2d at 643-44. When the owner of the oil and gas leasehold estate informally asserted claims against Rubin Resources, a settlement agreement was reached. Relying on *Calvert,* the trial court determined that the settlement precluded

---

[34]As we explained in *Morris*, transactional malpractice pertains to alleged wrong-doing in connection with the giving of advice or preparation of documents for a business transaction. *See Morris,* 237 W.Va. at 374, 787 S.E.2d at 645.

12

any finding that the malpractice damages sought by Rubin Resources were proximately caused by the attorney's admitted negligence.[35] When Rubin Resources argued that *Calvert* does not stand for the proposition that plaintiffs cannot maintain a legal malpractice action after settling a lawsuit, this Court emphatically agreed. 237 W.Va. at 376, 787 S.E.2d at 647.

In explanation of why the settlement in *Morris* was not a bar to a malpractice proceeding, we simply stated that this Court "declined [in *Calvert*] . . . to deviate from the proximate cause standard." *Id.* Acknowledging our lack of elaboration in *Morris,* we now clarify that the reason why a settlement agreement does not automatically extinguish a legal malpractice-based claim is because the settled claim is a separate and distinct claim from that of the malpractice action. In *Parnell v. Ivy*, 158 S.W.3d 924 (Tenn. Ct. App. 2004), a case we cited in *Morris,* the appellate court explained why a settlement of the underlying lawsuit does not stand as an automatic bar to a malpractice action: "Though the amount of damages in a malpractice action are measured with reference to the damages sought in the underlying suit, the injuries suffered by a plaintiff in a malpractice suit are separate and distinct from those suffered in the underlying suit." *Id.* at 927. Expounding further, the court observed:

> "Where the termination is by settlement rather than by a dismissal or adverse judgment, malpractice by the attorney is more difficult to establish, but a cause of action can be made out

---

[35]While admitting negligence as to the title examination, the attorney denied that his negligence proximately caused the damages sought by Rubin Resources.

13

> if it is shown that assent by the client to the settlement was compelled because prior misfeasance or nonfeasance by the attorneys left no other recourse * * * * [The] cause of action for legal malpractice must stand or fall on its own merits with no automatic waiver of a plaintiff's right to sue for malpractice merely because plaintiff had voluntarily agreed to enter into a stipulation of settlement."

*Parnell*, 158 S.W.3d at 928 (quoting *Titsworth v. Mondo*, 407 N.Y.2d 793, 796 (N.Y. Sup. Ct. 1978)).

By insisting that the IRS settlement precludes any subsequent determination of negligence on its part, MW demonstrates a flawed understanding of *Calvert*. Moreover, MW goes further astray in claiming that the petitioners' proof of damages is dependent on a judicial upholding of the IRS tax assessment.[36] Critically, the petitioners have not limited the recovery they seek from MW to the amounts they paid to settle the IRS tax assessment. The nature of their malpractice-based claims is decidedly broader than that. As set forth in the amended complaint, the petitioners' claims of legal malpractice, misrepresentation, and fraud are grounded in the following averments:

> 29. Plaintiffs specifically asked McGuire to ensure that none of the parties were engaged in any improper activities, it being the desire of Kay Co. and its shareholders to only complete the contemplated transaction if it was completely legitimate, and would not subject the Kay Co. or Kay LLC to any liability for corporate taxes arising out of the liquidation of the Portfolio Securities, thereby limiting their potential taxes only to the

---

[36]MW argues that absent a Tax Court ruling that the IRS assessment was valid, there can be no causal connection between the attorney's advice and the client's alleged damages.

14

capital gains attributable to their shares of the Kay Co. as outlined in the McGuireWoods opinion letter issued at closing.

30. In this regard, Plaintiffs on more than one occasion asked McGuire and Rohman to confirm that the transaction was legitimate and proper.

31. In response to these requests, McGuire assured the Plaintiffs of the transactions [sic] legitimacy. In fact a McGuire attorney stated, in an email to certain Kay Co. directors dated October 23, 2000, that Rohman "is confident that our tax structure could not be disregarded."

. . . .

35. McGuire had a duty and responsibility to inform and advise Plaintiffs of the potential tax liabilities they might face and the other consequences which Plaintiffs might incur if they entered into the transaction as designed by McGuire, or to advise Plaintiffs that they should not enter into the transaction due to the laws, rules and regulations of the Internal Revenue Service and the advisory opinions and letters and federal court opinions interpreting the same.

36. McGuire had a further duty and responsibility to Plaintiffs to investigate the validity of the purchaser of the stock of Kay Co. to reasonably ensure that the purchaser was a legitimate business and in full compliance with applicable tax laws and that the entity indeed had legitimately incurred tax losses in its business.

In specifying the damages they are seeking, the Petitioners aver the following: "Plaintiffs have been required to pay additional taxes, penalties and interest and incur legal fees, costs and expenses, . . . and have been embarrassed, humiliated, suffered emotional distress, lost income and opportunity in their business and personal finances and business, have suffered annoyance and inconvenience and have otherwise been damaged." Without a doubt, the IRS settlement is a component of the damages that the Petitioners seek.

15

Critically, however, the damage averments and the ad damnun clause are not confined to or limited by the amount of the IRS settlement.

While MW faults the petitioners for settling with the IRS rather than litigating until the issuance of a Tax Court ruling, the law does not penalize the petitioners for their decision. In fact, as we made clear in syllabus point four of *Morris*, the law encourages the mitigation of damages:

> A plaintiff in a legal malpractice action has a general duty to mitigate his or her damages. This doctrine requires a plaintiff to take reasonable steps within his or her ability to minimize losses caused by the attorney's negligence. However, a plaintiff is not required to take actions which are impractical, disproportionately expensive, or likely futile. The scope of a plaintiff's duty to mitigate damages depends on the particular facts of the case.

237 W.Va. at 372, 787 S.E.2d at 643; *see also Alagia, Day, Trautwein & Smith v. Broadbent*, 882 S.W.2d 121, 125-26 (Ky. 1994) (discussing fact that occurrence of legal harm and damages were fixed by settlement between IRS and taxpayer law firm).

Whether the petitioners in this case can meet the standard for establishing legal malpractice is far from clear. That standard was set forth in syllabus point one of *Calvert:* "Generally, in a suit against an attorney for negligence, the plaintiff must prove three things in order to recover: (1) the attorney's employment; (2) his/her neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the plaintiff."

16

217 W.Va. at 685, 619 S.E.2d at 198. Despite the uncertainty of whether the petitioners can prove any of their claims, one thing is certain–the existence of the IRS settlement does not serve as a bar to the petitioners' attempt to prove they were damaged as a result of the legal advice McGuireWoods provided to them.[37] As the court articulated in *Parnell*, although damages in a legal malpractice claim are measured with reference to the underlying claim of negligence, the malpractice claim is a separate and distinct claim. *See* 158 S.W.3d at 927. As a result, a settlement agreement does not automatically extinguish a legal malpractice claim.

In ruling that there were no genuine issues of fact to be resolved with regard to the petitioners' claims of legal malpractice, negligent misrepresentation, and fraud the circuit court committed error. However, we find no error in the trial court's rulings with regard to detrimental reliance[38] and joint venture, and accordingly affirm judgment for MW on those claims. Given the clear formation of the contract of legal representation in this

---

[37]While MW argues that the tax laws under which the IRS pursued the petitioners did not change until after the sale of Kay Co., the petitioners disagree and cite to a notice which was released by the IRS on August 13, 2000, prior to the sale, which indicates that "Son of Boss [bond and sales strategies]" transactions were illegal and thus subject to close scrutiny.

[38]*See supra* note 25.

17

state,[39] we find no merit to the cross-assignment through which MW seeks to apply Virginia's five-year statute of limitations for contract claims.[40]

Based on the foregoing, the summary judgment ruling entered by the Circuit Court of Kanawha County on May 27, 2015, is reversed; with regard to the clarifying rulings issued on December 5, 2016, we affirm the finding that the detrimental reliance claim is part of petitioners' fraud claim and we affirm the finding that the petitioners have failed to prove the existence of a joint venture; we reverse the findings that the petitioners' claims of legal malpractice, negligent misrepresentation, and fraud fail as a matter of law due to their settlement with the IRS; accordingly, this matter is remanded to the circuit court to permit the petitioners[41] to proceed on their claims of legal malpractice, negligent misrepresentation, and fraud.

Affirmed, in part; reversed, in part; and remanded.

---

[39]*See* Syl. Pt. 3, *State ex rel. Coral Pools, Inc. v. Knapp*, 147 W.Va. 704, 131 S.E.2d 81, 82 (1963) ("When a contract results from an offer made in one state and an acceptance in another state, the contract generally will be deemed to have been made in the state in which the acceptance occurs.").

[40]This Court's venue-based ruling in *Thornhill Group, Inc. v. King*, 233 W.Va. 564, 759 S.E.2d 795 (2014), has no bearing on the choice of law issue presented in this case.

[41]Mrs. Graham is included in this ruling. The fact that she did not settle with the IRS has no impact on anything other than the amount of her damages.

18