**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**Susan Spangler, Individually and as the**
**Personal Representative of the**
**Estate of Leroy Alfred Hazelock, Jr.,**
**Defendant Below, Petitioner**

**vs.) No. 21-0002** (Kanawha County 18-C-137)

**James Monroe Washington,**
**Plaintiff Below, Respondent**

## MEMORANDUM DECISION

Petitioner Susan Spangler, individually and as the personal representative of the estate of Leroy Alfred Hazelock, Jr. ("Leroy Jr."), by counsel Paul S. Saluja, appeals the December 1, 2020, order of the Circuit Court of Kanawha County that awarded Respondent James Monroe Washington damages for petitioner's failure to honor that portion of Leroy Jr.'s will that gave respondent the right of first refusal to purchase a house in Washington, D.C., which was part of Leroy Jr.'s estate. Respondent, by counsel Joshua S. Rogers, Jill Cranston Rice, and Arie M. Spitz, filed a response in support of the circuit court's order.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Leroy Alfred Hazelock, Sr. ("Leroy Sr.") owned a house in Washington, D.C. When he died, the executor and sole heir of his estate was his son, Leroy Jr. Thus, Leroy Jr. inherited the Washington, D.C. house (the "house"). However, Leroy Jr. died shortly thereafter. Leroy Jr.'s will bequeathed the bulk of his estate to his ex-wife, petitioner Susan Spangler. The estate included the proceeds from any sale of the house, but the will contained a "right of first refusal" that required petitioner to offer respondent the right to purchase the house before it was offered for public sale. Petitioner was appointed to serve as the executrix of Leroy Jr.'s estate. Soon thereafter, respondent told petitioner that he wished to exercise his right of first refusal and purchase the house, and petitioner agreed that she would sell respondent the house. By early July of 2017, petitioner and respondent agreed to a $475,000 purchase price for the house and respondent's adult son, Barry

1

Washington, texted petitioner asking her to send a "Letter of Request" regarding the agreed purchase price. On July 16, 2017, petitioner sent respondent's son a text which provided that she had "contacted attorneys regarding the sale of the home" and "[w]hen the probate process is completed, they will draw up a sales contract. I will contact you as soon as this process and contract is completed."

On August 8, 2017, respondent, having not received any letter of request or other communication, sent petitioner a certified letter again expressing his wish to exercise his right of first refusal. The letter also provided that respondent's son, Barry, would be the point of contact. Receiving no response, respondent's son e-mailed petitioner on September 15, 2017, inquiring about respondent's purchase of the house. Petitioner replied that she would be "in DC the later part of the week to meet with the attorney and a DC probate representative. I have already conferred the need for a real estate contract. Once this is completed, the law firm will set up a meeting. I will have more information after the meeting." Respondent's son thereafter sent follow-up e-mails but received no response from petitioner. Respondent learned on May 4, 2018, that petitioner had sold the house to an entity known as "6th Street" for $505,000 or $30,000 more than the price that respondent had negotiated with petitioner.

Respondent thereafter sued petitioner alleging breach of fiduciary duty and tortious interference with a testamentary bequest. Respondent then moved for summary judgment on liability for both causes of action. Attached to the motion were documents demonstrating that (1) petitioner was the executor of Leroy Jr.'s estate; (2) the will gave respondent the right of first refusal to purchase the house; (3) respondent sought to exercise that right; (4) petitioner twice told respondent that, on behalf of the estate, she would sell the house to him but that she had to wait until probate was completed and the lawyers drew up the contract; and (5) petitioner's representations to respondent were false given that she sold the house to a third party. Based on this evidence, the circuit court granted respondent partial summary judgment on the issue of liability, finding that petitioner breached her fiduciary duty as an executor and intentionally interfered with a testamentary bequest.

Thereafter, the circuit court held a bench trial on damages. At that trial, respondent entered the deposition testimony of Daniel Beard without objection from petitioner. Mr. Beard testified in his deposition as follows: He had worked as a general contractor for thirty-seven years, eight years of which involved working in real estate in the Washington, D.C. area. He consults with realtors, offers advice about the purchase and renovation of properties, and has done post-renovation valuations more than one hundred times. 6th Street, the entity that purchased the house, hired him to design the renovations to the house. 6th Street's plan was to invest $200,000.00 into the house and sell it for $1,100,000. However, after tearing out the back of the house to enlarge it, renovations were halted for six months due to permitting issues. During the delay, rain damaged the house necessitating additional repairs and renovations. 6th Street eventually paid between $350,000 and $400,000 to renovate the house and sold it for $985,000 on December 30, 2019. Mr. Beard opined that if the cost overruns due to the permitting problems and subsequent flooding encountered by 6th Street had not occurred, the house could have been sold for $1,100,000.

Respondent's counsel then called Barry Washington, respondent's son, who testified as follows: He worked for the federal government for thirty-seven years in architectural design,

2

project management, construction management, and build-out services, and he had been a licensed architectural designer for over twenty years. His father (respondent) had been managing real estate for the past twenty years, was a real estate investor, and – in the past – did high-end interior design work for embassies, for dignitaries, and for several presidents both in and out of the White House. Respondent also had his work shown in magazines such as Architectural Digest and people still seek out his father's services (even though at the time of trial he was ninety-one years old). Barry then explained why he was "kind of being the spokesperson" for his father. Specifically Barry said that his father had "slowed down" and that he just doesn't have the "capacity to want to – the drive and motivation – he seems to be stunned a little bit." Barry then explained the real estate renovation business that his father, he, and his wife, Gigi Washington, had run as a team for more than fifteen years. Barry said they locate properties, analyze them, decide whether to renovate them, and, if they opt to renovate, whether to sell or lease a renovated property. Barry then gave examples of the many homes and apartments that the family had acquired and renovated in the D.C./Maryland/Virginia housing market. Barry testified that his father has very extensive knowledge about architecture, quality work, and construction and, therefore, is at the "top of the process" and is also the principal investor for most of the properties they work on. Barry also said that his father coached Gigi Washington into getting her real estate license. Thereafter, Gigi obtained her broker's license and opened a real estate brokerage company. Barry further testified that the family buys a property outright and that they use their own money to renovate a property so that they own their properties free and clear. Barry said that he serves as a lead contractor and, in that role, obtains cost estimates and necessary permits, prepares the construction design and intent documents, and consults with the engineering disciplines.

Regarding the house, Barry testified in extraordinary detail about his cost estimates for renovating the house. Barry added that his estimate contained a little "fluff" or a "contingency" to address any overages. Barry said that he estimated that the house, when renovated, would have sold for $1,100,000 and that the profit on the house, after expenses, would have been $450,700. Barry further testified that when he worked for the federal government, his cost estimates were required to be within five percent of the actual final construction price.

Barry also addressed the permitting issues 6th Street encountered in working on the house and his own experience in working closely with the District of Columbia's permitting agency. Barry testified that he had never had a permit problem with any of the family's properties and never had a stop work order as did 6th Street.

Barry then testified regarding the effect on respondent of not being able to buy the house. Barry said that the house originally belonged to his father's favorite sister, that his father loaned the sister the down-payment for the house, and that his father was very close to the sister and would visit her at the house on a regular basis. Barry then testified to the letters and other communications he sent to petitioner on respondent's behalf regarding respondent's attempts to purchase the house. Barry said that when respondent learned that the house had been sold to someone else, he became "depressed, very upset, [and] angry . . . because he was working in good faith and he was manipulated in the process."

Barry's wife, Gigi Washington, testified next. She said that she has been a licensed realtor in Washington, D.C. for more than fifteen years, a real estate broker for several years, and that she

3

and her husband Barry operate a real estate brokerage company. She also said that she is a well-known real estate investor in the Washington, D.C. area and her primary role in the family business is to scout for potential properties. She said that she, Barry, and respondent then evaluate the properties, buy some of them, and then sell or hold the properties they buy. She also testified that she became a real estate broker at respondent's urging because

> [respondent] has always been a real estate investor and he really wanted someone on the real estate broker side to be able to help expedite processes and also have access to [the Multiple Listing Service], so that we can easily go in and do comparative market analysis for properties that we are considering, . . . it is a good easy way to determine value and what our return on investments will be.

Gigi further testified that she would have been the one to market and sell the house if they had acquired it, she would not have charged a commission for selling the house, and she would not have had to pay for marketing or advertising to sell the house because she had developed an internet-based marketing system that costs the family nothing. As for the sale price of the house, Gigi testified that the value of the house, based upon her performance of a competitive market analysis, was $1,100,000; and the sale of the home for $985,000 was not the best indicator of the house's value. She further testified that she had done "[h]undreds of such evaluations during her real estate career." She explained that 6th Street lowered their initial list price of $1,100,000 to $985,000 due to cost overruns, the permitting issues that resulted in a work stoppage, and the fact that 6th Street had to borrow money to finance the purchase of the home and the renovations. Gigi testified that she, Barry, and respondent had the experience to avoid permitting problems and self-financed their home purchases and renovations. Finally, Gigi testified that her calculation of respondent's lost potential profit on the house was between $425,000 and $450,000.

Respondent James Monroe Washington testified that he agreed with Barry's and Gigi's testimony. He said he had worked in construction and design since he was fifteen years old. As for the house, he said that he agreed to buy it for the price petitioner asked and that he was unhappy when petitioner sold it to another buyer. Respondent further stated that he asked his son Barry to get a lawyer and to bring an action against petitioner. Respondent described the house as "a very nice house." Respondent said that he thought, "well maybe I could move into that house, but my sister loved that house. She and her husband lived in there and had a wonderful time, and I miss them, and I love that house." Respondent concluded that he "felt very bad – very bad when I found out [petitioner] had already sold [the house]."

Petitioner testified briefly during her case-in-chief and then called her forensic accountant, David Epperly, who testified that 6th Street earned a profit on the sale of the house of $56,811 based on renovation costs of $375,000 and a real estate agent's 3% sales commission. Petitioner therefore argued that respondent's damages were limited to a recovery of $56,811.

By order entered December 1, 2020, the circuit court reinstated its earlier conclusion that petitioner, as the executor of Leroy Jr.'s estate, breached her fiduciary duty and tortiously interfered with a testamentary bequest. The circuit court then ruled that (1) respondent was deprived of the right to purchase the house for $475,000; and (2) if respondent had been allowed to purchase the house for that price, he could have invested $200,000, sold the house for

4

$1,100,000, and realized a profit of $425,000 to $450,000. Accordingly, the court found that petitioner tortiously deprived respondent of $425,000 in profits and awarded that amount in damages. The court further found that respondent was entitled to recover damages for emotional distress, annoyance, and inconvenience and awarded $25,000 as damages. Finally, the court found that, pursuant to West Virginia Code § 55-7-25(a), respondent presented "clear and convincing evidence that the damages [he] suffered were the result of the conduct that was carried out by [petitioner] with actual malice toward [respondent]." Accordingly, the court awarded respondent $150,000 in punitive damages. Petitioner now appeals.

On appeal, petitioner first argues that the circuit court erred in granting partial summary judgment to respondent on the issue of liability regarding her sale of the house to 6th Street. Petitioner contends that the circuit court's findings are inconsistent, that the will placed the burden on closing the sale of the house within ninety days on respondent, and that a District of Columbia probate court found that respondent's right of first refusal had expired under the will by its own terms.

We review a circuit court's entry of summary judgment de novo. Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).

The circuit court found that petitioner, as the executor of Leroy Jr.'s estate, breached her fiduciary duty when she sold the house to 6th Street. We have defined an executor's fiduciary duty in this way:

> The personal representative of the estate of a deceased acts in a fiduciary capacity. H[er] duty is to manage the estate under h[er] control to the advantage of those interested in it and to act on their behalf. In the discharge of this duty, the executor or administrator of a deceased's estate is held to the highest degree of good faith and is required to exercise the ordinary care and reasonable diligence which prudent persons ordinarily exercise, under like circumstances, in their own personal affairs.

Syl. Pt. 1, *Latimer v. Mechling*, 171 W. Va. 729, 301 S.E.2d 819 (1983). Thus, petitioner had a duty to manage the estate in a manner that protected respondent's interests. Specifically, she was obligated to diligently discharge her duty to give respondent the right of first refusal to purchase the house. The record shows that petitioner applied to serve as executor in June of 2017. By early July, petitioner had recognized her duty under the will and reached a sale price with respondent. In mid-July, petitioner told respondent that she would send a sales contract once the probate process was completed, and in September she told respondent she was still waiting for her attorneys to draw up the paperwork. Respondent wrote letters and emails to petitioner stating a willingness to complete the purchase. Despite respondent's persistent efforts to purchase the house, petitioner sold it to a third party in May of 2018 for a higher price. On this record, petitioner had a fiduciary duty to honor respondent's exercise of his right of first refusal to purchase the house. Accordingly, we find no error in the circuit court's conclusion that respondent breached that duty when she instead sold the house to 6th Street.

Petitioner also tortiously interfered with a testamentary bequest by failing to sell respondent the house. West Virginia has recognized the tort of interfering with a testamentary bequest. *See* Syl. Pt. 2, *Barone v. Barone*, 170 W. Va. 407, 294 S.E.2d 260 (1982) ("An intended beneficiary may sue for tortious interference with a testamentary bequest."). The elements of a tortious interference claim with business relations are "'(1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages.'" *Kelley v. Kelley*, No. 15-0188, 2015 WL 7628821, at *16 (W. Va. Nov. 23, 2015)(memorandum decision) (quoting *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 314 S.E.2d 166, 167 (1983)). Here, respondent had a reasonable expectancy that petitioner, as the executor of Leroy Jr.'s estate, would provide him a right of first refusal for the house as required by Leroy Jr.'s will. Petitioner intentionally interfered with that expectancy, caused the harm respondent sustained (the ability to purchase the house), and respondent's resulting damages. Based on this record, we find that the circuit court did not err in finding that petitioner, as the executor of Leroy Jr.'s estate, breached her fiduciary duty when she sold the house to 6th Street and that she, therefore, tortiously interfered with a testamentary bequest. Thus, we uphold the circuit's court's grant of summary judgment to respondent on the issue of liability.

Petitioner next argues that the circuit court erred in permitting Barry Washington, respondent's son, to act as the de facto plaintiff below. Petitioner asserts that respondent is elderly and was incapable of restoring the house himself. She also asserts that respondent participated nominally in the case and generally acquiesced to his son's testimony. Finally, petitioner contends that respondent's comment that he wanted to live in the house was wholly contrary to Barry Washington's statement that the family wanted to flip the house. Thus, she concludes that Barry Washington was the real party in interest and that the trial court erred in allowing him to act as the plaintiff below.

> "In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syl. Pt. 1, *Pub. Citizen, Inc. v. First Nat'l Bank in Fairmont*, 198 W.Va. 329, 480 S.E.2d 538 (1996).

Syl. Pt. 2, *Harrell v. Cain*, 242 W. Va. 194, 832 S.E.2d 120 (2019).

> A circuit court's finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Board of Educ. v. Wirt*, 192 W.Va. 568, 579 n. 14, 453 S.E.2d 402, 413 n. 14 (1994), quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948).

*Pub. Citizen, Inc.*, 198 W.Va. at 334, 480 S.E.2d at 543.

The circuit court's findings, that respondent wanted to buy the house, remodel it, and then sell it, were not clearly erroneous. The evidence shows that respondent's son Barry negotiated with petitioner for the price of the house and that respondent wanted to exercise his right of first refusal and to purchase the house. Further, Barry testified to respondent's ability, personally, and with the assistance of Barry and Gigi, to renovate the house and to sell it for a profit. That this evidence was admitted through Barry's testimony is of no moment given that respondent testified that he agreed with Barry's and Gigi's testimony and that he wanted Barry to handle the buying of the house.

Respondent also testified about his history with, and sentimental feelings for, the house. Specifically, respondent testified that his sister had owned the house, which he loved, and that he might move into it. In weighing this testimony, the circuit court found that respondent's fond memories of his sister's house did not mean that after he purchased the house and renovated it, he intended to live in it. Instead, the circuit court found that respondent agreed with Barry and Gigi Washington's testimony that he intended to renovate and sell the house. The trial court's finding that respondent had the ability, with the help of Barry and Gigi, to renovate and sell the house was also not clearly erroneous. Respondent presented evidence that he, Barry, and Gigi had the skill and knowledge to renovate and sell the house, and that Barry and Gigi would help respondent in those endeavors. Accordingly, the circuit court's finding that respondent, with the help of his family, had the ability to renovate and sell the house was not clear error. Thus, we reject petitioner's claim that the circuit court permitted Barry Washington, respondent's son, to act as the de facto plaintiff below.

In petitioner's third and fourth assignments of error, she argues that the circuit court erred in finding that respondent was entitled to damages based on the "speculative testimony" of Barry and Gigi Washington. We review these assignments for clear error under *Public Citizen, Inc.*

As noted above, in addition to the testimony of Barry and Gigi Washington at the trial in this matter, respondent entered the testimony of Dan Beard, whom 6th Street hired to renovate the house. Also as noted above, Mr. Beard testified that if respondent had the capability to renovate the house, a $200,000 investment in the house would have yielded a sales price of $1,100,000. Mr. Beard further testified that his opinion was based on his own work on the house; his thirty-seven years as a general contractor, which included eight years of contracting work in Washington, D.C.; his experience consulting with realtors regarding the purchase and renovation of real properties, as well as anticipating post-renovation values, which he had done about one hundred times; and his comparison of the house with comparable properties in Washington, D.C. Petitioner lodged no objections to Mr. Beard's testimony, just as she lodged no objections to Barry or Gigi Washington's testimony.

"[P]arties must still make it clear that they object to the ruling or order of the court in order to preserve such matter for appeal[.]" *Maples v. W. Virginia Dep't of Com., Div. of Parks & Recreation*, 197 W. Va. 318, 322, 475 S.E.2d 410, 414 (1996). "'"Where objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal." Syl. pt. 1, *State Road Commission v. Ferguson*, 148 W.Va. 742, 137 S.E.2d 206 (1964).' Syllabus point 1, *Estep v. Brewer*, 192 W.Va. 511, 453 S.E.2d 345 (1994)." *Maples*, 197 W. Va. at 319, 475 S.E.2d at 411, Syl. Pt. 2. Here,

petitioner failed to object to Barry Washington's testimony, Gigi Washington's testimony, or Mr. Beard's testimony. On this record, we find that the circuit court did not clearly err in relying on that testimony in finding that respondent was entitled to damages

Petitioner's fifth assignment of error regards the testimony of her forensic economist who produced a report in response to Mr. Beard's testimony. In a skeletal argument, petitioner contends that the circuit court erred in discounting her forensic economist's qualifications and report because, under *Cell, Inc. v. Ranson Investors*, 189 W. Va. 13, 427 S.E.2d 447 (1992), "there was a need for expert testimony here and [p]etitioner was denied any meaningful opportunity to provide the same."

We often have cautioned that "'[a] skeletal "argument," really nothing more than an assertion, does not preserve a claim . . . . Judges are not like pigs, hunting for truffles buried in briefs.'" *W. Va. Dep't of Health & Human Res., Child Advocate Office ex rel. Robert Michael B. v. Robert Morris N.*, 195 W. Va. 759, 765, 466 S.E.2d 827, 833 (1995) (quoting *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *see also State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues [that] are . . . mentioned only in passing but [that] are not supported with pertinent authority, are not considered on appeal."). Accordingly, we do not further address this assignment of error.

Finally, in petitioner's sixth assignment of error, she claims that the circuit court erred in the amount of damages it awarded to respondent.

We disagree and find that the circuit court correctly concluded that respondent could recover the profit of which he was deprived as a result of petitioner's failure to sell him the house. *See* 22 Am. Jur. 2d Damages § 266 (2021) ("Generally, damages for tortious interference with contract are calculated to place the injured party in the position he or she would have been in had the contract been performed."). Thus, based on the evidence before it, the circuit court correctly awarded respondent $425,000.

Moreover, the circuit court correctly concluded that respondent proved a loss of $425,000 with reasonable certainty. Damages for lost profits "must be established with reasonable certainty and not be speculative or conjectural in character or amount." *Rubin Res., Inc. v. Morris*, 237 W. Va. 370, 379, 787 S.E.2d 641, 650 (2016). "[D]amages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *Given v. Field*, 199 W. Va. 394, 398, 484 S.E.2d 647, 651 (1997) (citing *Restatement (Second) of Contracts* § 352, cmt. b (1981)).

> Damages are recoverable only to the extent that the evidence shows with reasonable certainty the damage sustained as a result of the negligence and affords a sufficient basis for estimating the amount in money with reasonable certainty. Similarly, plaintiffs will not be denied recovery of damages for breach of contract merely because the damages are difficult to ascertain so long as they prove damages with reasonable certainty.

Reasonable certainty requires proof of a rational basis for measuring the loss, without allowing a jury to speculate. Reasonable certainty does not mean precise or mathematical certainty. Reasonable certainty does not require absolute assurance or mathematical exactitude; rather, the evidence need only be sufficient to remove the existence of damages from the realm of speculation and provide a reasonable basis for computing an approximate amount of damages. For instance, the absence of a mathematical formula for gauging the future probability of the harm occurring or the monetary value of that loss does not prevent the recovery of monetary damages for future harm. When damages are difficult to prove, the plaintiff is required to prove them with the precision that the facts permit but no more.

22 Am. Jur. 2d Damages § 340 (2021) (footnotes omitted).

Here, respondent demonstrated his lost damages with reasonable certainty through the testimony of Mr. Beard, Barry Washington, and Gigi Washington. Accordingly, we find that the circuit court did not err in finding, with reasonable certainty, that respondent's economic damages were $425,000, and in awarding that amount to petitioner.

Accordingly, for the foregoing reasons, we affirm the circuit court's December 1, 2020, order.

Affirmed.

**ISSUED:** January 12, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton

9